OPINION OF THE COURT
Martin Rodell, J.
This is a habeas corpus proceeding instituted by a natural mother, wherein she seeks the return of her five-month-old son. After a plenary hearing, the following facts are manifest:
In midsummer, 1980, the petitioner, a 16-year-old unwed high school student, discovered that she was pregnant. She immediately informed her parents, with whom she resides, of her condition. On August 8,1980, the petitioner, accompanied by her mother, went to the East Bronx Medical Group, where she was examined by a physician and her pregnancy of approximately 30 weeks was confirmed. It appears that during that visit the possibility of an adoption was discussed, and the physician said that he would inquire whether any of his patients would be interested in adopting a baby. On September 2 of that year, the petitioner made a third visit to the medical group, wherein the examining physician advised that his wife’s cousin was seeking a child for adoption. It appears that the physician initiated the subject of adoption and advised the petitioner *1099 that a lawyer would contact the family. Shortly thereafter, an attorney representing the respondent (adoptive father) contacted the parents of the petitioner mother, and offered to arrange for the adoption of the petitioner’s baby. Although no formal understanding was arrived at during that conversation, the attorney forwarded to the parents a letter which purportedly confirmed the petitioner’s intention to place her child for adoption with the clients whom the attorney represented. In that letter was enclosed a paper bearing the legend “irrevocable consent” which was to be signed by the petitioner in the presence of the attorney.
At the hearing the attorney testified that on September 28, 1980 she called the parents to ascertain “if they were still interested”, since she had her clients to think of. It came to pass that on or about October 14, 1980 the infant petitioner and her parents called at the attorney’s office. The attorney testified “I told them that I was going to have this form of irrevocable consent. If petitioner signed that, this would be the basis for me to receive that baby at the hospital. I am not an adoption agency. I wanted a basis for me to be at that hospital and receive the child. I said this is the form that we use in the Surrogate Court *** This is a form of irrevocable consent *** you are signing this today *** you have a right to change your mind at any time up to the point you walk into chambers *** you can even tell the Surrogate that today you are changing your mind and you want this child back *** when you are signing this **'* this is the basis for me to receive this child at the hospital.” It appears that the petitioner did in fact sign the consent form which left blank such items as the date of birth, the sex of the child, and the child’s first name. At this meeting it was agreed that the child would receive its first name from the petitioner’s family, and that the child would be raised in the Catholic faith. The petitioner refused to reveal the name of the natural father to facilitate the adoption, to a point that she burst into tears and ran from the office. The parents remained to discuss the payment of the petitioner’s medical bills.
On November 6, 1980 the petitioner gave birth to a son. When on November 7, the attorney telephoned the peti *1100 tioner’s father to discuss the discharge of the baby, he became indignant and said he would not go through with the adoption. However, on November 9, he telephoned the attorney and told her to come to the hospital to receive the baby. During a tearful episode, the petitioner’s mother delivered her grandson to the attorney, who thereupon brought the child to her clients. Subsequently the parents received a check in the sum of $2,500 to cover medical and hospital bills. On December 17 the petitioner’s father telephoned the attorney and informed her that the petitioner wished to have her son returned. The attorney insisted on a personal request and the petitioner thereupon advised the attorney of her demand. This demand was not adhered to, and the instant proceeding was instituted.
By virtue of its general equitable jurisdiction, this court has authority to make an order or direction as to the custody and control of infants within the State. It may exercise its jurisdiction to do so either upon writ of habeas corpus or upon petition. (Finlay v Finlay, 240 NY 429, 432; People ex rel. Harris v Commissioner of Welfare of City of N. Y., 188 Misc 919.) The respondent argues that the writ must be dismissed because the question of revocation can only be decided by the Surrogate’s Court, Queens County. A similar argument was raised in the case of People ex rel. Anonymous v Anonymous (19 Misc 2d 441, 445-446). It was determined therein that since only the Supreme Court may award custody (People ex rel. Kropp v Shepsky, 305 NY 465), relator may invoke the broad equity powers of the Supreme Court to determine in one proceeding the question as to whether she is entitled to custody of the child, and the effectiveness of her attempted revocation of consent. The writ may not be defeated by the technical arguments which respondents advance, namely, that the filing with the Surrogate’s Court of relator’s consent gives that consent the status of a mandate of the Surrogate’s Court; that pursuant thereto, the respondents legally hold the infant, notwithstanding relator’s later revocation of the consent. (See People ex rel. Anonymous v Anonymous, 195 Misc 1054.) Furthermore, this court is of the opinion that this proceeding was properly commenced and that the petitioners’ sole remedy does not lie with section 115-b of *1101 the Domestic Relations Law. Section 115-b of the Domestic Relations Law permits a parent to revoke his consent to adoption only if it has not become irrevocable under the provisions of this section and only on giving notice in writing of such action to the court in which the adoption proceeding has been or is to be commenced. Under section 115-b (subd' 3, par [b]) “[i]f, at the time of filing of the petition for adoption, or within thirty days thereafter, the court has received or shall receive such notice of revocation, the court shall promptly notify the adoptive parents”.
In the instant matter, the petitioners have moved for the immediate custody of the child without waiting for the “time of filing of the petition for adoption, or within thirty days thereafter” to seek immediate relief.
As to the specific merits of the petition, this court is not convinced that we are dealing with a revocation of a valid consent. In fact, subdivision 4 of section 115-b of the Domestic Relations Law is more appropriate: “nor shall this section bar actions or proceedings brought on the ground of fraud, duress or coercion in the execution or inducement of an adoption consent.”
From the hearing, it is evident that on or about October 14, 1980, before there was a child to be adopted, the natural mother purportedly signed an irrevocable consent. Since there is no abandonment alleged, the consent of the child’s parent is necessary for the adoption. (Matter of Livingston, 151 App Div 1; Matter of Bistany, 239 NY 19; Matter of Willing, 43 NYS2d 834; Matter of Anonymous, 60 Misc 2d 854, 858.) Section 111 (subd 1, par [c]) of the Domestic Relations Law, applicable to the instant case, provides: “Subject to the limitations hereinafter set forth consent to adoption shall be required as follows * * * (c) Of the mother, whether adult or infant, of a child born out of wedlock”. Without addressing the question of a natural father’s consent, as recently ruled upon in Caban v Mohammed (441 US 380), it is clear that in order for the consent to be valid ab initio, it must run from a mother of a child already born out of wedlock.
In the opinion of this court, any consent to adoption of an unborn child is not in conformance with statute. Further *1102 more, subdivision 1 of section 109 of the Domestic Relations Law clearly defines “ ‘adoptee’ shall mean a person adopted.” The court holds that for the purposes of this statute and for reasons of public policy, an unborn child was never intended to be included in the definition of a person, as enunciated in the Domestic Relations Law. It has long been held that adoption is a status created by the State; since it is entirely statutory and is in derogation of common law, the adoption statutes must be strictly construed. (Matter of Linda F.M., 95 Misc 2d 581; Matter of Pyung B., 83 Misc 2d 794; Anonymous v Anonymous, 15 Misc 2d 1048.) Accordingly, this court finds that the so-called consent signed by the natural mother on October 14, 1980, before the birth of the adoptee, is void ab initio.
Another basis for invalidation of the consent ab initio is that admittedly the consent form left blank such items as the date of birth, the sex of the child, and the child’s first name. Such information was eventually filled in, after the birth. Case law dictates that a consent given under such circumstances must be deemed invalid on the basis of misrepresentation.
In Matter of Anonymous (60 Misc 2d 854, supra), the acknowledgment of the signatures was made after they were signed by a notary who did not see them, and they were not present before the notary, notwithstanding the recital to that effect in the acknowledgment. In Matter of Emanuel T. (81 Misc 2d 535, 539), the purported affidavits of consent were postdated and notarized by the petitioners’* attorney (who also acted as notary) with a date after the infant’s birth, although in fact signed by the natural mother and grandmother a month prior thereto. Such misrepresentation with respect to private placement adoption consents has been deemed in the afore-mentioned cases, in and of themselves, to invalidate the consent.
There is another important consideration regarding the circumstances surrounding the securing of the mother’s initial consent, which renders such consent invalid. In Matter of Anonymous (60 Misc 2d 854, 858, supra), the court points out that the “proof here is clear that when consent was obtained the mother had no attorney or independent legal advice *** no adequate explanation of the *1103 meaning or effect was given, the mother and her parents were under the impression that placement was a temporary arrangement, and that the child would be returned if requested *** It seems to the court that public policy requires that petitioner have the burden of affirmatively showing that a consent of an infant parent was obtained voluntarily with full knowledge of its effect and understanding of the consequences, and with adequate independent advice from sources other than petitioner’s own attorney or agent. (See Matter of Creekmore, 1 N. Y. 2d 284.)”
The unique history of the case involves a doctor, who from the record appears to have a personal interest in the ultimate disposition of the adoption, his wife being a first cousin of the adoptive mother. This certainly is a factor which cannot be overlooked in the determination of voluntary consent obtained from the infant parent.
The emotional reaction of the infant parent, as evidenced by her abrupt departure from the attorney’s office during the meeting of October 14, 1980, coupled with the uncertain and fluctuating behavior of her parents, has cast a shadow of doubt upon the voluntary nature and understanding of the consent.
In the instant case, ¿adequate explanation was not given to the parents regarding the consent and its implications, and instead the purpose of obtaining such an irrevocable consent, according to the testimony of the attorney, was the basis for her to receive the child at the hospital.
If it were not sufficient to invalidate the consent on the ground of the misrepresentation in its execution, pursuant to subdivision 4 of section 115-b of the Domestic Relations Law, this court would be constrained to entertain the writ for failure to comply with the Social Services Law (§ 871, subd 10, par [b]; subd 12; § 374, subd 2). Section 371 (subd 10, par [b]) states: “[a]uthorized agency” means “[a]ny court or any public welfare official of this state authorized by law to place out or to board out children”. This court comes to the conclusion similar to that in Matter of Anonymous (46 Misc 2d 928) that the attorney in this proceeding does not qualify as an authorized agent, pursuant to the Social Services Law of the State of New York. Under *1104 subdivision 12 of section 371, “[p]lace out” means “to arrange for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care”. Subdivision 2 of section 374 states: “No person *** except an authorized agency shall place out or board out any child but the provisions of this section shall not restrict or limit the right of a parent, legal guardian or relative within the second degree to place out or board out a child.”
It is conceded that the attorney was not an authorized agency and the adoptive parents or attorney are not related to this child within the second degree and, therefore, it must follow that this child has not been “placed out” in accordance with the law of the State of New York. For reasons of public policy, the improper handling of the child in Matter of Anonymous (46 Misc 2d 928, supra) resulted in the removal of the child from the custody of the adoptive parents. (Also see Matter of Anonymous [G.], 89 Misc 2d 514.) Such public policy considerations are applicable in the instant case.
An important question to be addressed is whether the court must consider this nullification of the consent as equal to and on the same footing with a revocation of the consent, pursuant to section 115-b of the Domestic Relations Law. If such were the case, then the provisions of section 115-b (subd 3, par [d], els [ii], [v]) would be dispositive of this case, namely, the best interests of the child. Only then would clause (v) apply: “In such proceeding the parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents, notwithstanding that the parent or parents who have consented to the adoption are fit, competent, and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition.” However, this statutory provision only applies where a proper and valid form of consent to adoption has been filed. This statute, which purports to limit a most fundamental right, that of parent *1105 hood, must be strictly construed. (Matter of Monroe, 132 Misc 279.) In fact, this relatively new statutory provision overrules the historic presumption that a natural parent will not be deprived of custody, unless the natural parent is established by clear and convincing proof to be either unfit or unable to take care of the infant. (People ex rel. Kropp v Shepsky, 305 NY 465, supra; People ex rel. Portnoy v Strasser, 303 NY 539.)
However, it has been decided in Matter of James M. G. (86 Misc 2d 960), that when the statutory procedure under section 115-b of the Domestic Relations Law is inapplicable, as in the instant case, and where there is no consent to be properly revoked, the court must be guided by the strict common-law presumption which obtains ás to custody and not by clause (v). As the court succinctly stated in Matter of Corey L v Martin L (45 NY2d 383, 386-387): “Despite recent changes in statutory law, there remains a heavy burden of constitutional magnitude on one who would terminate the rights of a natural parent through adoption.”
There has always been an abiding respect for the rights of natural parents. (People ex rel. Kropp v Shepsky, 305 NY 465, supra.) Termination of parental status and rights must be viewed as intrinsically more serious than custody awards of infants away from parents. Since the issue is the determination of the natural parent’s right to her child, not merely one of visitation or custody, the untainted consent of the natural parent or proof of an abandonment is a prerequisite to the judicial determination of her parental relationship. (See Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96.) A recent restatement of the primacy of the right of a natural parent to custody of his child is to be found in Matter of Mitchell (70 AD2d 367, 371): “Where the issue is the right of a natural parent to custody of his child, it is established that a parent cannot be replaced because someone else could do a better job of raising the child; rather, only when ‘extraordinary circumstances’ such as abandonment, unfitness or persistent neglect are found, ‘the court must then make the disposition that it is in the best interests of the child’ ”Matter of Bennett v Jeffreys, 40 NY2d 543, 548; Raysor v Gabbey, 57 AD2d 437).
*1106 The proof in this proceeding indicated that the adoptive parents are individuals of good moral character, capable of caring for the infant. However, the proof does not establish that the natural mother was either unfit or incapable of caring for the infant. (Matter of James M.G., 86 Misc 2d 960, supra; Matter of Anonymous, NYLJ, May 2, 1974, p 18, col 2.) It merely shows that she has been the victim of personal pressures and now wishes sincerely to regain., custody of her child. This is not a custodial proceeding in which parental ties would be preserved. It is a proceeding which involves the severance of all parental ties with the child’s mother, the grandparents and other relatives. Such factors must be considered. (Matter of Ekstrom, 24 AD2d 276.)
Under the circumstances this court holds that there is no valid consent and the papers executed by the natural mother do not comply with section 115-b of the Domestic Relations Law so as to remove the presumption in her favor of a superior right to the custody of the child. There has been a complete failure of proof of unfitness or incapability on the part of the natural mother.
The court can appreciate the despair that this determination may visit upon the respondents. Their only motive was to bring love and affection to a child whom they were led to believe was unwanted. The finger of blame should deservedly be pointed at the petitioner’s parents, whose indecisiveness and vacillation caused the heartbreak which envelops this ¡proceeding.
This being a superior right to custody in favor of the natural mother, the writ of habeas corpus is sustained, without costs. The infant shall be delivered to the natural mother at a place to be agreed upon by the attorneys on or before May 15,1981, unless counsel stipulates to an earlier time and place.