LEMLEY ET AL., APPELLEES, *v.* KAISER ET AL., APPELLANTS.

[Cite as Lemley *v.* Kaiser (1983), 6 Ohio St. 3d 258.]

(No. 82-1348—Decided August 24, 1983.)

*Mr. Charles L. Burd,* for appellees.
*Mr. J. B. Collier, Jr.,* for appellants.

ALICE ROBIE RESNICK, J. We are confronted with a factual milieu which forcefully suggests and overwhelmingly implies that appellants were active participants in the private, independent, and surreptitious placement for adoption of the minor child without the slightest regard for and in complete contravention of the applicable statutory guidelines for such independent placements. The record before us indicates that when testifying at the evidentiary hearing conducted by the juvenile court, appellants skillfully avoided admitting that which seemingly may not be denied. The record, however, is abundantly clear that the private, independent, and surreptitious placement of the minor child in the instant case was only accomplished through a total derogation of the law.

The procedure for independently placing a child for adoption is plainly and succinctly set forth in R.C. 5103.16, which provides in pertinent part:

"No child shall be placed or received for adoption or with intent to adopt unless placement is made by a county welfare department having a child welfare division, county children services board, the department of public welfare, an organization authorized to place children for adoption under a

certificate of the department of public welfare, or custodians in a foreign state or country, or unless *all of the following criteria are met:*

"(A) Prior to the placement and receiving of the child, the parent or parents of the child have personally applied to, and appeared before, the probate court of the county in which the parent or parents reside, or in which the person seeking to adopt the child resides, for approval of the proposed placement specified in the application and have signed and filed with the court a written statement showing that the parent or parents are aware of their right to contest the decree of adoption subject to the limitations of section 3107.16 of the Revised Code;

"(B) The court, after an independent investigation of the proposed placement, conducted as provided in section 3107.12 of the Revised Code, and after completion of the investigation has determined that the proposed placement is in the best interests of the child;

"(C) The court has approved of record the proposed placement." (Emphasis added.)

Although R.C. 5103.16 is not part and parcel of the adoption statutes, it is in substance an adoption statute. As such, R.C. 5103.16 is necessarily in derogation of the common law and must be strictly construed. *Campbell* v. *Musart Society* (P.C. 1956), 72 Ohio Law Abs. 46, 50; *In re Wedl* (P.C. 1952), 65 Ohio Law Abs. 231, 236. See *Anonymous* v. *Anonymous* (1981), 108 Misc. 2d 1098, 1102, 439 N.Y. Supp. 2d 255. Further, because the provisions authorizing adoptions are purely statutory, strict compliance with them is necessary. *In re Privette* (1932), 45 Ohio App. 51, 52; *Anonymous, supra.* The intent of the legislature in enacting R.C. 5103.16 was to provide some measure of judicial control over the placement of children for adoption which is not conducted under the auspices of a statutorily recognized and authorized agency. That measure of judicial control is accomplished by having the parents of the child personally appear before the proper probate court for approval of the placement and adoption. *In re Harshey* (1974), 40 Ohio App. 2d 157, 163 [69 O.O.2d 165]. " 'The integrity of this [statutory] process is an absolute necessity.' " *In re Adoption of Daniel C.* (1982), 115 Misc. 2d 130, 453 N.Y. Supp. 2d 572, 575. Otherwise, children could be sold to the highest bidder and shuffled around like objects on an auction block.

Appellants assert that they did not represent appellee or the father in this matter, even though appellee and the father approached appellants for their professional assistance in the placement of their son for adoption. The record does reveal, however, that appellants proceeded with the placement of the child knowing full well that neither of the child's parents had petitioned the probate court in the county where they resided or in the county where the allegedly prospective adoptive parent or parents resided[2] for an independent placement of their son pursuant to R.C. 5103.16.

Further, appellants knew that a probate court had not made a determina-

_____
[2] See R.C. 5103.16 (A).

tion that the placement was in the best interests of the child[3] and that no probate court had of record approved the proposed placement.[4] Even though appellee was a minor when she signed her original consent to the placement, surrender, and proposed adoption of her son, said consent would have been valid if it had been executed before the probate court judge or an authorized deputy or referee of the probate court as contemplated by statute.[5] See R.C. 5103.16. Assuming *arguendo* that appellants did not represent appellee and the father in the placement of their son, appellants nevertheless proceeded with and facilitated said placement in violation of R.C. 5103.16.

With this background, we now proceed to address appellants' arguments. Appellants contend in their first proposition of law that since it is unrefuted that they do not have nor did they have at the time the habeas corpus petition was filed, physical control or custody over the minor child, it was error for the court to direct the issuance of the writ against them.

Initially, we recognize that a petition for writ of habeas corpus shall specify, *inter alia,* the name of the person illegally confined and in whose behalf the petition is brought, the name of the person who is confining the individual in whose behalf the petition is brought, and if known, the place where that individual is so illegally restrained or confined. R.C. 2725.04. As a general rule, the respondent in a habeas corpus petition is the person who holds custody and is able to physically produce the person who is allegedly being illegally restrained. See *Santa Clara Pueblo* v. *Martinez* (1978), 436 U.S. 49, 59; *Hancock* v. *State* (Fla. App. 1980), 386 So. 2d 613, 614; *Peyton* v. *Nord* (1968), 78 N.M. 717, 437 P. 2d 716; *In re Striker* (1956), 101 Ohio App. 455. In order for the writ to properly issue, it is essential that the petition specify the person by whom the individual in whose behalf the writ is sought is being allegedly illegally restrained. *Merritt* v. *Booker* (Ala. 1978), 362 So. 2d 878.

We must emphasize, however, that R.C. 2725.04 provides that if the name of the person who is the custodian of an illegally restrained person is unknown, such person may be described by an assumed appellation. This was precisely the procedure utilized in the instant case. The petition for the writ

---

[3] See R.C. 5103.16 (B).

[4] See R.C. 5103.16 (C).

[5] Although not raised by the parties, we parenthetically note that even though the child was born out of wedlock, since the minor child's name is stated as being Bobby Lee Nash, Jr., it appears that Nash, Sr., must have signed the child's birth certificate as provided in R.C. 3705.14, legitimized the child pursuant to R.C. 2105.18, or at least acknowledged the child in a writing sworn to before a notary public prior to the placement of the child in the allegedly prospective adoptive parents' custody. In any of these events, it readily appears that Nash, Sr.'s consent is also necessary before the child, Nash, Jr., can be adopted. R.C. 3107.06; *Caban* v. *Mohammed* (1979), 441 U.S. 380. We make this observation since R.C. 3705.14 provides that "[a] child born out of wedlock shall be registered by the surname of the mother * * *."

Also, we further note that both the juvenile court and the court of appeals determined that Ms. Lemley's consent was given under duress. See *In re Hua* (1980), 62 Ohio St. 2d 227, 232 [16 O.O.3d 270]. Therefore, Ms. Lemley's consent is necessarily invalid. *Hua, supra.*

of habeas corpus named appellants and "Jane Doe, the unknown custodian of the minor child * * *," as respondents. Such petition is not, therefore, fatally defective on its face. Cf. *In re Calhoun* (1976), 47 Ohio St. 2d 15, 18 [1 O.O.3d 10].

At the hearing conducted by the juvenile court, appellee and the father testified that they relinquished possession of the child to appellants at their law office. Appellants admitted the delivery of the child and further testified that the child was subsequently delivered to the allegedly prospective adoptive parents whose name and address appellants refused to disclose. From appellants' testimony, it becomes obvious that appellants were inextricably involved in the illegal and surreptitious placement of the child. Appellants procured from appellee certain documentation, offered advice and consultation to appellee and father, and facilitated the placement of the child. Appellants' involvement was most certainly active rather than passive. Appellants are the last known persons to have knowledge of the whereabouts of the child. The only other persons to have any knowledge of the child's present address and location are those unknown allegedly prospective adoptive parents. It was only through appellants' direct involvement that the illegal placement of the minor child was obtained by the allegedly prospective adoptive parent or parents. See *Nguyen Da Yen v. Kissinger* (C.A. 9, 1975), 528 F. 2d 1194, 1202-1203.

The United States Supreme Court commented in *Harris v. Nelson* (1969), 394 U.S. 286, 291-292, regarding habeas corpus relief:

"* * * The scope and flexibility of the writ [habeas corpus]—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

"As Blackstone phrased it, habeas corpus is 'the great and efficacious writ, in all manner of illegal confinement.' * * * [T]he office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.'

"* * *

"There is no higher duty of a court, * * * than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law. * * *"

To permit appellants to prevail would be tantamount to the highest court in this state placing its *imprimatur* upon the core injustice created by appellants' actions. The juvenile court determined that a child placement in contravention of law had occurred and recognized that appellants were the only persons who presently knew the location of the child. That court noted appellants' entanglement in facilitating the illegal custody resulting from the

unlawful placement. Because of the urgency of the requested relief and in light of the extraordinary circumstances of this case, this court holds that the juvenile court correctly issued the writ of habeas corpus.[6]

Appellants, in their second proposition of law, contend that they should not be compelled to disclose the names and addresses of their alleged clients, asserting that this information is protected by the attorney-client privilege.

The historical development and background of the attorney-client privilege is thoroughly discussed in Chief Justice Marshall's opinion in *Spitzer* v. *Stillings* (1924), 109 Ohio St. 297, and we, therefore, need not repeat that discussion here. The Ohio Legislature has codified the common-law attorney-client privilege in R.C. 2317.02, which states in pertinent part:

"The following persons shall not testify in certain respects:

"(A) An attorney, concerning a communication made to him by his client[7] in that relation or his advice to his client; but the attorney may testify by express consent of the client, or if the client is deceased, by the express consent of the surviving spouse or the executor or administrator of the estate of such deceased client; and if the client voluntarily testifies, the attorney may be compelled to testify on the same subject;"

Absent the express consent of appellants' alleged clients, we must determine whether their names and addresses fall under the umbrella of communications made to appellants during the attorney-client relationship or in appellants' advice to their clients.

This court stated in *In re Martin* (1943), 141 Ohio St. 87, 103 [25 O.O. 225], which statement was reaffirmed in *Waldmann* v. *Waldmann* (1976), 48 Ohio St. 2d 176, 178, that it is well-settled that the burden of showing that

---

[6] Another consideration in affirming the trial court's issuance of a habeas corpus writ to appellants is the possible, if not probable jurisdictional quagmire which likely could arise in the instant case. Although unknown, the present location of the minor child could very well be in a state other than Ohio, and if the juvenile court had not acted as it did, this unlawful placement would, in effect, have received judicial approval. If by chance the location of the child is outside of this state, then arguably, an Ohio court would be without authority to issue a writ to its physical custodian ordering the return of the child. However, those most closely involved with this unlawful placement, namely appellants, are subject to the jurisdiction of the courts of this state.

[7] R.C. 2317.021 states:

"As used in division (A) of section 2317.02 of the Revised Code:

" 'Client' means a person, firm, partnership, corporation, or other association that, directly or through any representative, consults an attorney for the purpose of retaining the attorney or securing legal service or advice from him in his professional capacity, or consults an attorney employee for legal service or advice, and who communicates, either directly or through an agent, employee, or other representative, with such attorney; and includes an incompetent whose guardian so consults the attorney in behalf of the incompetent.

"Where a corporation or association is a client having the privilege and it has been dissolved, the privilege shall extend to the last board of directors, their successors or assigns, or to the trustees, their successors or assigns.

"This section shall be construed as in addition to, and not in limitation of, other laws affording protection to communications under the attorney-client privilege."

testimony sought to be excluded under the doctrine of privileged attorney-client communications rests upon the parties seeking to exclude it. Further, it must be shown that the communications claimed as privileged are connected with and related to the matter for which the attorney had been retained. See Annotation (1967), 16 A.L.R. 3d 1047.

In most instances, the client's name or identity "is not one of the facts about which the client seeks legal assistance; the legal advice will in no way depend on whether the client's name is Jones or Smith." Saltzburg, Communication Falling Within the Attorney-Client Privilege (1981), 66 Iowa L. Rev. 811, 821. If a case falls plainly within the reason and spirit of R.C. 2317.02 (A), its principles shall apply even though a client's name and address may not, in most circumstances, be within the strictures of R.C. 2317.02 (A). *Waldmann, supra,* at 177.

*Waldmann* was a domestic relations case where the confidentiality of the client's address was necessary to protect the client's safety. See *Brennan* v. *Brennan* (1980), 281 Pa. Super. 362, 422 A. 2d 510. Our use of limiting language regarding the applicability of the attorney-client privilege to a client's name and address[8] in *Waldmann* implicitly, if not explicitly, illustrates our belief that "[i]n the determination [of] whether a communication by a client to an attorney should be afforded the cloak of privilege, ' "much ought to depend on the circumstances of each case." ' [Citations omitted]." *In re Jacqueline F.* (1979), 47 N.Y. 2d 215, 222, 391 N.E. 2d 967. It has been held that the attorney-client privilege only exists to aid in the administration of justice. *Brennan, supra,* at 372. Necessarily, then, it may not be said that our holding in *Waldmann* affords the cloak of privilege to a client's name and address in all cases under all circumstances. With the above principles in mind, we proceed with our analysis of whether, under the circumstances presented by the case *sub judice,* the names and addresses of appellants' alleged clients should be given the cloak of protection afforded by the attorney-client privilege.

We are persuaded by the rationale and holding in two New York cases which we believe to be dispositive of the issue with which we are now confronted. In *Anonymous* v. *Anonymous* (1969), 59 Misc. 2d 149, 298 N.Y. Supp. 2d 345, a child was born out of wedlock to a nineteen year old mother who had made arrangements for the child's adoption with an anonymous couple prior to the child's birth. After surrendering her child, the mother sought her child's return through habeas corpus proceedings, naming the couple's attorney, together with the anonymous couple, as respondents. Attorney-respondent asserted the attorney-client privilege and refused to reveal his

---

[8] This court's holding in *Waldmann, supra,* at 177-178, was much narrower than the holding in the appellate decision in *In re Heile* (1939), 65 Ohio App. 45 [18 O.O. 274], where the appellate court stated at 49:

"* * * where the [attorney-client] privilege exists, it includes the protection of the name and address of the client."

clients' identity. The court, in directing the attorney-respondent to disclose his clients' identity, simply stated:

"No legitimate reason has been urged upon this court except the bare claim of confidentiality of the clients' identity which would require this court to respect the claim of confidentiality. On the contrary, the only purpose served by respecting this claim of confidentiality would be to frustrate this court's legitimate processes and concern for the welfare of the child." *Anonymous, supra,* at 151.

In *Tierney* v. *Flower* (1969), 32 A.D. 2d 392, 302 N.Y. Supp. 2d 640, a child, was born out of wedlock to a minor woman. The child's mother and maternal grandfather consulted with an attorney regarding placement and adoption of the expectant child prior to the child's birth. Upon leaving the hospital, the mother delivered her child to a man and a woman in the hospital parking lot. She did not know the identity of the couple, but was advised by the attorney that they would be in a beige automobile. More than a year later, the child's mother informed the attorney that she desired the return of her child. The attorney consulted with his clients, instructing them to refuse the mother's request and to refrain from revealing their identity or the location of the child. Subsequently, the child's mother filed a habeas corpus petition in which the attorney was named the respondent as the only person with knowledge of the identity of the child's custodian. The clients were named on the petition as "John Doe" and "Mary Doe." The petition was served only upon the attorney. Further, at the time the petition was filed, the status of the alleged adoption proceedings could not be ascertained.

At the hearing, the attorney continually refused to reveal his clients' identity, but admitted that they did indeed have possession of the child. The *Tierney* court emphatically commented at 395-396:

"In our opinion, there is no competent reason why the Supreme Court [appellate division] should uphold the claim of confidential relationship between the appellant and his clients to the point of sealing their identity where the safe and proper custody of a child is involved, particularly where, as at bar, the infant is out of the custody of his mother and is not lodged in the custody of persons who have any legal authorization for their assumption of control over the infant. The Supreme Court's overriding concern with the welfare of the infant as a ward of the court overbalances any interest of technical claim on the appellant's part with respect to the confidential relationship between him and his clients.

"We reject the appellant's contention that the cases in which disclosure of the names and addresses of clients was required or restricted to situations in which the attorney-client relationship exists in the very litigation where disclosure is sought and that such case law has no application at bar where the attorney is not representing any client but appears and contests as a principal. The disclosure of the client's identity is required where, as at bar, injury would result to the proper administration of justice 'immeasurably greater than the benefit that would enure to the relation of attorney and

client.' * * * The seal of secrecy between attorney and client is to be preserved 'in the aid of a public purpose to expose wrongdoing and not * * * to conceal wrongdoing.' * * * '[T]he veil [of privilege is removed] from the client's name when the attorney's assertion of a privilege is a cover for cooperation in wrongdoing.' [Citations omitted.]"

We, therefore, conclude that when the peculiar factual environment and the egregious circumstances of the instant case are properly considered in light of our holding regarding the attorney-client privilege in *Waldmann, supra,* the names and addresses of appellants' alleged clients are not entitled to the cloak of protection afforded by the attorney-client privilege.[9]

Accordingly, based on the foregoing, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

CELEBREZZE, C. J., W. BROWN, LOCHER, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

RESNICK, J., of the Sixth Appellate District, sitting for SWEENEY, J.

---

[9] *Waldmann* v. *Waldmann* (1976), 48 Ohio St. 2d 176 [2 O.O.3d 373], distinguished.