JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Patricia Jackson appeals from her conviction for ten counts of deception to obtain dangerous drugs in violation of R.C. 2925.22. The appellant was placed on community control sanctions for two years. The appellant chose a trial to the bench.
 {¶ 2} Cleveland Police Detective Thomas Shoulders and Cleveland Police Detective Greg Whitney received a Drug Utilization Report (hereinafter D.U.R.)[1] from Agent Lynn Mudra of the State Pharmacy Board concerning the appellant. The D.U.R. is a report which reflects an individual's physician, the prescriptions obtained, and the pharmacy at which the prescription was filled. The appellant's D.U.R. indicated that the appellant visited different doctors, obtained a prescription for the same drug, and had the prescriptions filled at different pharmacies. Both police officers testified that this is an indication of a pattern of abuse of acetaminophen with codeine (hereinafter Tylenol #3), a schedule III drug.
 {¶ 3} In the course of his investigation, the detectives contacted Dr. William Bohl, Dr. Edwin Thompson, and Dr. Victorio Rodriguez. Various drug stores which had filled the appellant's prescriptions were also contacted. The prescriptions obtained from the pharmacies corresponded to those listed on the D.U.R.
 {¶ 4} Detective Greg Whitney testified that the appellant was arrested at the office of Dr. William Bohl. The doctor's office staff contacted the police department and notified them that the appellant had made an appointment. Detective Whitney proceeded to Dr. Bohl's office at that scheduled time and arrested the appellant.
 {¶ 5} Agent Mudra testified that he is an Agent with the State of Ohio assigned to the Board of Pharmacy. When an individual visits different doctors on the same day, or days in close succession, and obtains the same prescription, the information is easily reviewable on the D.U.R. Agent Mudra stated that the D.U.R. indicates a National Drug Code for the specific drug, the name of the pharmacy that filled the prescription, the drug name, the unit doses that were dispensed, the date the drug was dispensed, the cost of the specific prescription, the dispensing physician, and the name of the recipient of the drug. After reviewing the appellant's dates of obtaining the prescriptions for Tylenol #3, the number of unit doses, and the places the prescriptions were dispensed, Agent Mudra testified that the appellant's method of obtaining Tylenol #3 was unusual.
 {¶ 6} The trial court received the testimony of Dr. William Bohl, Dr. Edwin Thompson, and Dr. Victorio Rodriguez, the three physicians who had prescribed Tylenol #3 for the appellant. Each doctor testified that a routine patient history is taken from each patient and then follow up questions are asked of the patient by the doctor. Each physician testified that he did not know that the appellant was receiving the drug from another physician, and that he would not have prescribed the medication if he had such knowledge. Each of the doctors testified as to the prescriptions for Tylenol #3 he had written for the appellant, the dates of the prescriptions, and the unit dosage prescribed. The details outlined in the following chart were testified to by the individual doctors.
 {¶ 7} Date Doctor unit doses of Tylenol #3
 {¶ 8} 11/16/98 Thompson 28
 {¶ 9} 11/16/98 Bohl 30
 {¶ 10} 12/10/98 Thompson 28
 {¶ 11} 12/11/98 Bohl 40
 {¶ 12} 12/28/98 Thompson 28
 {¶ 13} 12/29/98 Rodriguez 10
 {¶ 14} 01/16/99[2] Rodriguez 10
 {¶ 15} 01/18/99 Thompson 28
 {¶ 16} 03/01/99 Thompson 28
 {¶ 17} 03/01/99 Rodriguez 10
 {¶ 18} Dr. Edwin Thompson identified the appellant as the patient for whom he had written prescriptions. He testified that he had performed surgery on the appellant in August 1998 to remove two screws from her left foot. On her intake form in his office the appellant noted that she was seeing Dr. Rodriguez. Dr. Thompson routinely asks patients what medication they are receiving from other physicians. Dr. Thompson identified the prescriptions he had written for the appellant. He also stated that Tylenol #3 is a schedule III drug and that it can be addictive. The drug can be a dangerous drug if taken in excessive amounts.
 {¶ 19} Dr. William Bohl testified that he received the appellant as a patient through a referral of Dr. Tim Fetterman. The appellant had undergone a laminectomy for a ruptured disk in her back. Dr. Bohl obtained a patient history, examined the patient, and prescribed 30 unit doses of Tylenol #3. Dr. Bohl was unaware that the appellant was also seeing Dr. Thompson and had no indication that the appellant was receiving pain medication from any other physician. Dr. Bohl testified that Tylenol #3 can be a dangerous drug and that it can be addictive. If he had known she was receiving the medication from another physician, he would not have prescribed it for the appellant.
 {¶ 20} Dr. Vitorio Rodriguez identified the appellant in the courtroom as his patient. He testified that had he known the appellant was receiving Tylenol #3 from other physicians he would not have prescribed it for the appellant. Dr. Rodriguez stated that his wife, a pharmacist, is his office manager and it is she that takes the history of his patients for the chart. Dr. Rodriguez testified that in addition to the answers he receives as a result of this history, he inquires of his patients as to their current doctors and medications. He will not take patients who are seeing another physician.
 {¶ 21} The appellant asserts three assignments of error.
 {¶ 22} The first assignment of error:
 {¶ 23} THE TESTIMONY OF APPELLANT'S THREE DOCTORS, THOMPSON, BOHL AND RODRIGUEZ, VIOLATED APPELLANT'S PHYSICIAN-PATIENT PRIVILEGE, PURSUANT TO EVID (sic) R. 501 AND R.C. 2317.02(B).
 {¶ 24} The appellant asserts that although there was no objection raised at trial, it was plain error for the court to consider the testimony of the appellant's three doctors because she had not waived the physician-patient privilege.
 {¶ 25} As the appellant properly points out, the standard of review for this issue in the case at bar is plain error because defendant failed to object to the testimony of the doctors at trial. A finding of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.State v. Sims (1982), 3 Ohio App.3d 331, 335, quoting State v. Long
(1978), 53 Ohio St.2d 91, syllabus paragraph three. Unless it can be said that but for the error, the outcome would clearly have been otherwise, we cannot reverse. State v. Nicholas (1993), 66 Ohio St.3d 431.
 {¶ 26} The statute governing privilege is R.C. 2317.02(B)(1) and prohibits the testimony of a physician made concerning a communication made by the patient in the doctor-patient relationship and prohibits the physician's testimony regarding advice given to the patient. This privilege is waived under certain circumstances and the physician may be compelled to testify. See R.C. 2317.02(B). The word communication as defined in the statute means acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician or dentist to diagnose, treat, prescribe, or act for a patient. A communication may include, but is not limited to, any medical or dental record, chart, letter, memorandum, laboratory test and results, x-ray, photograph, financial statement, diagnosis, or prognosis. R.C. 2317.02.
 {¶ 27} In State v. Spencer (1998), 126 Ohio App.3d 335, this court considered a case analogous to the one sub judice. This court held that:
 {¶ 28} The intent of the privilege is to encourage a patient to be completely candid with his/her physician, thus enabling more complete treatment by the physician. See Ohio State Medical Bd. v. Miller (1989), 44 Ohio St.3d 136, 541 N.E.2d 602. Stated differently, "the purpose of this privilege is to encourage patients to make a full disclosure of their symptoms and conditions to their physicians without fear that such matters will later become public." State v. Antill (1964), 176 Ohio St. 61, 64-65, 197 N.E.2d 548.
 {¶ 29} By its very terms, the physician-patient privilege only attaches to communications made within the physician-patient relationship — that is, communications made relating to the medical treatment of the patient. If the communication between the physician and patient purports a fraud and/or other criminal activity, the relationship is not established and the privilege does not attach. See State v. Garrett
(1983), 8 Ohio App.3d 244, 456 N.E.2d 1319; State v. McGriff (1996), 109 Ohio App.3d 668, 672 N.E.2d 1074. This is analogous to a situation where the attorney-client privilege cannot be asserted as a cover for wrongdoing. See Lemley v. Kaiser (1983), 6 Ohio St.3d 258, 452 N.E.2d 1304.
 {¶ 30} The Spencer court went on to hold:
 {¶ 31} When the unrebutted evidence supports the contention that prescribed pharmaceuticals far exceed the dosage levels generally accepted in the medical community, that circumstance takes the claimed "communication" outside the realm of "privilege." Inordinate amounts of prescribed drugs immediately raise red flags and suggest activity not within the scope of "privileged communication." See State v. Moss, 1993 Ohio App. LEXIS 2491 (May 13, 1993), Cuyahoga App. No. 62318-62322, unreported; State v. McCarthy, 1991 Ohio App. LEXIS 4518 (Sept. 24, 1991), Montgomery App. No. 12123, unreported. To permit a claim of physician-patient privilege wherein there is reasonable articulable evidence supporting a suspicion of criminality would work a fraud upon the court. Such a claim cannot be embraced.
 {¶ 32} The record in this case demonstrates that the appellant was visiting multiple physicians in order to obtain multiple prescriptions for the identical controlled drug. The appellant then secured the drugs from multiple pharmacies. Pursuant to this court's reported decision inSpencer, supra, no physician-patient relationship was established because the appellant's purpose in visiting the doctors was not for treatment, but rather was to deceptively secure a controlled substance. Thus, the physicians' testimony was admissible and the plain error analysis is not applicable.
 {¶ 33} The first assignment of error is overruled.
 {¶ 34} The second assignment of error:
 {¶ 35} THE EVIDENCE IS INSUFFICIENT, AS A MATTER OF LAW, TO CONVICT APPELLANT OF ANY COUNT OF DECEPTION TO OBTAIN A DANGEROUS DRUG, IN VIOLATION OF R.C. 2925.22, SINCE THE STATE NEGLECTED TO PROVE THAT THE DRUGS IN THE CASE AT BAR WERE "DANGEROUS DRUGS" AS DEFINED IN R.C. 4729.01(F).
 {¶ 36} The appellant argues the trial court should have granted her motion for acquittal made pursuant to Crim.R. 29 because the appellee failed to prove an essential element of the crime. The appellant posits that the appellee failed to present evidence that the drug purchased by the appellant was a dangerous drug pursuant to R.C. 4729.01(F).
 {¶ 37} In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court found that with respect to sufficiency of the evidence, in essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. at 386. In addition, a conviction based upon legally insufficient evidence is a denial of due process. Thompkins, supra, citing to Tibbs v.Florida (1982), 457 U.S. 31, 45. As Justice Cook succinctly stated in the concurrence of Thompkins, a challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. Courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.
 {¶ 38} In R.C. 2925.22 the legislature has defined the crime of deception to obtain a dangerous drug:
 {¶ 39} (A) No person, by deception, as defined in section 2913.01 of the Revised Code, shall procure the administration of, a prescription for, or the dispensing of, a dangerous drug or shall possess an uncompleted preprinted prescription blank used for writing a prescription for a dangerous drug.
 {¶ 40} The definition of a dangerous drug may be found at R.C.4729.01(F). A drug which may be dispensed only upon a prescription under R.C. 3719 falls within the parameters of a dangerous drug.[3] Turning to R.C. 3719, this court notes that R.C. 3719.01(C) defines a controlled substance as a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV or V. In R.C. 3719.06 the legislature set forth the requirement that controlled substances may only be obtained by prescription. Therefore, a controlled substance which requires a prescription to be obtained is a dangerous drug.
 {¶ 41} The testimony of the doctors and the detectives clearly provided the trial court with the information that Tylenol #3 is a schedule III drug. The trial court thus received sufficient evidence to support the appellant's conviction because the testimony indicated that the Tylenol #3 is a controlled substance and thus qualifies as a dangerous drug.
 {¶ 42} The second assignment of error is overruled.
 {¶ 43} The third assignment of error:
 {¶ 44} APPELLANT'S CONVICTION FOR DECEPTION TO OBTAIN DANGEROUS DRUGS, IN VIOLATION OF R.C. 2925.22, ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 45} The appellant asserts that her convictions are against the manifest weight of the evidence because the evidence presented by the state was not credible. The appellant contends that one physician could not identify the appellant in court, the drug utilization report was hearsay, and that the amount of drugs obtained by the appellant through the prescriptions did not amount to over medication.
 {¶ 46} In State v. Nields (2001), 93 Ohio St.3d 6, the court held that, as to the manifest weight of the evidence, the issue is whether "there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." State v. Getsy (1998), 84 Ohio St.3d 180, 193-194, citing Statev. Eley (1978), 56 Ohio St.2d 169, syllabus. In Thompkins, supra, the Court illuminated its test for manifest weight of the evidence by citing to Black's Law Dictionary (6 Ed. 1990) at 1594:
 {¶ 47} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
 {¶ 48} Thus, as the concurring opinion noted, when deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion. The only special deference given in a manifest weight review attaches to the conclusion reached by the trier of fact.Thompkins, (Cook, J., concurring) citing to State v. DeHass (1967),10 Ohio St.2d 230.
 {¶ 49} As noted in the second assignment of error, supra, deception to obtain a dangerous drug is prohibited in R.C. 2925.22. The pertinent language of the statute prohibits a person, by deception, from procuring a prescription for a dangerous drug. The elements of the crime require to be proven by the state herein are: 1) the appellant's deception; 2) the appellant's procurement of the prescription; and, 3) evidence that the prescription was for a dangerous drug.
 {¶ 50} Dr. Thompson and Dr. Rodriguez positively identified the appellant. The fact that Dr. Bohl could not identify the appellant in court is not persuasive enough to require this court to find that the weight of the evidence does not support the conviction. It must be noted that the prescriptions written by Dr. Bohl were admitted as evidence, that Dr. Bohl's business records reflect that he treated the appellant, that Dr. Rodriguez testified that he referred the appellant to Dr. Bohl, and more importantly, that the appellant was actually arrested in Dr. Bohl's office.
 {¶ 51} Turning next to the allusion that the drug utilization report should not have been admitted as evidence, this court finds that even if there is a violation of the Rules of Evidence, it does not overcome the testimony of the three doctors as to the appellant's procurement of the prescriptions for the dangerous drug. Finally, R.C.2925.22 makes no requirement that the amount of the drugs obtained via the prescriptions must amount to overmedication.
 {¶ 52} The evidence presented by the state represents substantial evidence and supports the convictions. The trial court did not lose its way, and this is not "`the exceptional case in which the evidence weighs heavily against conviction.'" See Nields, supra, citing State v. Lindsey
(2000), 87 Ohio St.3d 479, 483, quoting State v. Thompkins (1997),78 Ohio St.3d 380, 387.
 {¶ 53} The third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANNE L. KILBANE, J., and DIANE KARPINSKI, J., CONCUR.
[1] The testimony of Agent Mudra reveals that the D.U.R. is prepared by Medicaid and reviewed by the State Department of Health and Human Services when it pays the Medicaid bill. Upon review by the Health and Human Services, the report is turned over to the Pharmacy Board, and then to Agent Mudra. Agent Mudra then forwards the report to the local police department for investigation. Agent Mudra informed the court that this information is gathered in the normal course of business.
[2] The indictment was amended at trial to reflect that the actual date was January 16, 1999 and not January 21, 1999 as stated in the indictment.
[3] R.C. 3719.01(D) defines a dangerous drug as having the same meaning as given in R.C. 4729.01.