DECISION AND JUDGMENT ENTRY
{¶ 1} Alice Lynd appeals the trial court's judgment finding her in contempt of court for failing to testify before the Scioto County Grand Jury. She asserts that the court abused its discretion by finding her in contempt because its order to testify was unlawful as it required her to violate the attorney-client privilege. However some evidence supports the court's finding that an attorney-client relationship did not cover the statements Lynd seeks to keep confidential. Because the statements were not privileged, the trial court appropriately ordered her to testify before the grand jury. When Lynd failed to comply with the court's lawful order, the court had the discretion to find her in contempt. There is nothing in the record to suggest that the court acted arbitrarily, irrationally or capriciously in doing so. Because the court did not abuse its discretion, we affirm its judgment.
 {¶ 2} In early 2004, the Lucasville Riot Special Prosecutor learned Lynd had information that inmate Eric Girdy participated in the killing of inmate Earl Elder during the 1993 Lucasville prison riot. Subsequently, the prosecutor issued a grand jury subpoena to Lynd requesting her to testify about her conversation with Girdy.
 {¶ 3} Lynd filed a motion to quash the subpoena. She contended that the attorney-client privilege protected any information she had learned from Girdy and prohibited her from testifying before the grand jury regarding her conversation with him. Lynd asserted that at the time she learned information about the Elder murder, Girdy was her client. She explained that she initially met Girdy in 1998 when she interviewed him to see whether he possessed any information that might help her client, George Skatzes, seek postconviction relief. Lynd asserted that Girdy "came to rely on [her] advice and/or counsel; having communications with her which fell squarely within the ambit of those privileged as between attorney and client, although no such relationship as between Lynd and Girdy was formalized, until 2001 when Lynd became counsel for a plaintiff class of prisoners of which Girdy is a member."
 {¶ 4} After interviewing Girdy in her efforts to further Skatzes' postconviction claims, Lynd executed an affidavit that memorialized her conversation with Girdy and she forwarded it to Skatzes' pro bono lawyers. The affidavit contained statements that implicated Girdy and exculpated Skatzes in certain events surrounding the Lucasville prison riots. Lynd asserted that Skatzes' pro bono lawyers used her affidavit when filing Skatzes' postconviction petition, over her "strong objection." Lynd recognizes that the affidavit is public record now, but claims that the additional information she may have is privileged.
 {¶ 5} At the hearing on the motion to quash, Lynd testified she was representing Skatzes when she first met with Girdy in 1998. Girdy was aware that she represented Skatzes. Admittedly, the reason she visited Girdy was in "the hope of getting Mr. Skatzes some type of post-conviction relief." She stated that she met with Girdy "because we were speaking with a number of prisoners who had been involved in the Lucasville riot trying to get information that could be helpful to George Skatzes, but it was in that context that Mr. Girdy sought assistance for himself that was unrelated to anything that we were doing for George Skatzes. He didn't ask us to try to get into what he did or didn't do. He was asking more for enforcement of his plea agreement." She believes that an attorney-client relationship existed because Girdy requested legal services, which she provided during 1998 and again in 2000. Lynd stated that during the 1998 interview, Girdy requested help regarding the enforcement of his plea agreement, his right to refuse a polygraph, and his possible placement in Administrative Control, Protective Control, the Ohio State Penitentiary, or out-of-state transfer. Girdy asked her to contact various third parties and provide him with legal advice. Lynd performed some of the following services: she contacted other attorneys for advice; she made phone calls to the Ohio State Highway Patrol to obtain an address that Girdy needed; she spoke with employees of the Correctional Institution Inspection Committee; she phoned the public defender because Girdy had requested a document and did not receive a response; and she attempted to locate his prior counsel.
 {¶ 6} From the end of 1998 to May of 2000, Lynd had no contact with Girdy. In May of 2000, Girdy wrote her a letter regarding the conditions at the Ohio State Penitentiary, which caused Lynd to later visit him in prison. Lynd asked Girdy additional questions about what he observed during the Lucasville riot. During this interview, Girdy "made a statement in relation to his own participation in what happened to Earl Elder during the Lucasville disturbance in 1993." Lynd testified that Girdy "confided in me something so serious that there is no way he would have said that if he didn't regard me as his attorney." She is "absolutely convinced that he confided in me expecting me to keep his confidence." However, because Lynd represented Skatzes and because the information would help Skatzes' postconviction relief claims, she informed Girdy that she would have to share the information with Skatzes' pro bono attorneys whom she was assisting.
 {¶ 7} Following the hearing, the parties submitted written arguments. The state argued after Lynd told Girdy that she would have to relay the information to Skatzes' attorneys, Girdy's failure to object resulted in waiver of the privilege. The state noted that Lynd "swears that she specifically told Girdy that she would have to tell George Skatzes and his attorneys what Girdy had told her. She then proceeded to do just that * * *. She then memorialized what Girdy said in affidavit form, and sent it to Skatzes' attorneys (who obviously were not counsel for Girdy) who then filed it in Court. Lynd[`]s late claim of privilege is transparently false."
 {¶ 8} The trial court subsequently denied the motion to quash. The court found that Lynd first met with Girdy in 1998 to help Skatzes obtain postconviction relief. Lynd stated in an affidavit: "I told Mr. Girdy that I will have to tell George Skatzes[`] attorneys what he had told us." The court observed: "There is no claim that Girdy told her not to do this. In fact, Lynd did tell those attorneys, and gave them an affidavit implicating Girdy in the homicide. This is a complete refutation of her current claim of attorney-client relationship." The court observed that Lynd did not subpoena Girdy to testify at the hearing regarding her motion to quash. The court concluded that Lynd failed to meet her burden of proof that an attorney-client relationship existed and denied her motion to quash the subpoena.
 {¶ 9} Lynd subsequently failed to testify before the grand jury, and the court found her in contempt. She timely appealed the court's judgment[1] and assigns the following error:
The trial court abused its discretion when it held the appellant in contempt of court where the order compelling her to testify was not lawful.
 {¶ 10} We review a trial court's decision in contempt proceedings for an abuse of discretion. See, e.g., State ex rel.Ventrone v. Birkel (1981), 65 Ohio St.2d 10, 11,417 N.E.2d 1249. An abuse of discretion means more than an error of law or judgment. Instead, it means that the court's attitude was unreasonable, unconscionable, or arbitrary. See, e.g., State v.Lessin (1993), 67 Ohio St.3d 487, 494, 620 N.E.2d 72; Rock v.Cabral (1993), 67 Ohio St.3d 108, 112, 616 N.E.2d 218. When applying the abuse of discretion standard of review, we are not free to merely substitute our judgment for that of the trial court. See, e.g., In re Jane Doe 1 (1991), 57 Ohio St.3d 135,137-138, 566 N.E.2d 1181, citing Berk v. Matthews (1990),53 Ohio St.3d 161, 169, 559 N.E.2d 1301.
 {¶ 11} Contempt proceedings are means through which the courts enforce their lawful orders. Caldwell v. Caldwell,
Gallia App. No. 02CA17, 2003-Ohio-1752, at ¶ 18, citingCincinnati v. Cincinnati Dist. Council 51 (1973),35 Ohio St.2d 197, 202, 299 N.E.2d 686. Lynd contends that the court's order that she testify before the grand jury was not lawful because it required her to violate the attorney-client privilege; since the court's order was not lawful, it lacked authority to find her in contempt. To resolve this matter, we must determine whether the evidence requires a finding that an attorney-client relationship existed between Lynd and Girdy.
 {¶ 12} "The determination of the existence of an attorney-client relationship will not be reversed when that determination is supported by substantial evidence." HenryFilters, Inc. v. Peabody Barnes, Inc. (1992),82 Ohio App.3d 255, 261, 611 N.E.2d 873, citing Jackson v. Johnson (1992),5 Cal.App.4th 1350, 7 Cal.Rptr.2d 482, and In re Thorup (D.C.App. 1983), 461 A.2d 1018, 1019. This is essentially a manifest weight of the evidence question where our standard of review is quite deferential. See Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 461 N.E.2d 1273.
 {¶ 13} It is beyond dispute that confidences gleaned during an attorney-client relationship are, with little exception, sacrosanct. See R.C. 2317.02; Kala v. Aluminum Smelting Refining Co., Inc. (1998), 81 Ohio St.3d 1, 4, 688 N.E.2d 258
("A fundamental principle in the attorney-client relationship is that the attorney shall maintain the confidentiality of any information learned during the attorney-client relationship.");Waldmann v. Waldmann (1976), 48 Ohio St.2d 176, 177,358 N.E.2d 521 ("It is the public policy of this state that an attorney shall not testify concerning a communication made to him by his client in that relation."). "This professional duty exists to safeguard client confidences and secrets to ensure the client's complete trust in the attorney and the client's freedom to divulge anything and everything needed for the client's proper and effective representation." Akron Bar Assn. v. Holder,102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426, at ¶ 37.
 {¶ 14} To invoke the attorney-client privilege, an attorney-client relationship must actually exist. The party asserting attorney-client privilege carries the burden of proving that an attorney-client relationship exists. See Shaffer v.Ohio Health Corp., Franklin App. No. 03AP-102, 2004-Ohio-63, at ¶ 8, citing Waldmann v. Waldmann (1976), 48 Ohio St.2d 176, 178,358 N.E.2d 521, and Lemley v. Kaiser (1983), 6 Ohio St.3d 258,263-64, 452 N.E.2d 1304. The person seeking to protect evidence under the aegis of the attorney-client privilege must not only show the existence of that relationship. She must also show "that the communications claimed as privileged are connected with and related to the matter for which the attorney had been retained."Lemley v. Kaiser (1983), 6 Ohio St.3d 258, 264, 452 N.E.2d 1304
(citation omitted).
 {¶ 15} "[N]either a formal contract nor the payment of a retainer is necessary to trigger the creation of the attorney-client relationship. See, e.g., In re DisciplinaryAction Against Giese (N.D. 2003), 662 N.W.2d 250. While it is true that an attorney-client relationship may be formed by the express terms of a contract, it `can also be formed by implication based on conduct of the lawyer and expectations of the client.' Guttenburg Snyder, The Law of Professional Responsibility in Ohio (1992) 62, Section 3.1." Cuyahoga CountyBar Assn. v. Hardiman, 100 Ohio St.3d 260, 2003-Ohio-5596,798 N.E.2d 369, at ¶ 10. In deciding whether an attorney-client relationship exists, "* * * the ultimate issue is whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client." Henry Filters, Inc. v. Peabody Barnes,Inc. (1992), 82 Ohio App.3d 255, 261, 611 N.E.2d 873; see, also,Cuyahoga County Bar Assn. v. Hardiman, 100 Ohio St.3d 260,2003-Ohio-5596, 798 N.E.2d 369, at ¶ 10 ("The determination of whether an attorney-client relationship was created turns largely on the reasonable belief of the prospective client."); Lillbackv. Metropolitan Life Ins. Co. (1994), 94 Ohio App.3d 100, 108,640 N.E.2d 250; David v. Scharzwald, Robiner, Wolk Rock Co.,L.P.A. (1992), 79 Ohio App.3d 786, 798, 607 N.E.2d 1173. If an attorney-client relationship does not exist or if the statements do not relate to that relationship, communications between the attorney and putative client are not privileged.
 {¶ 16} In this case, our review is limited because Lynd did not request Civ.R. 52 findings of fact and conclusions of law. When a party fails to request Civ.R. 52 findings of fact and conclusions of law, "the reviewing court must presume that the trial court applied the law correctly and must affirm if there is some evidence to support the judgment." Ratliff v. Ohio Dept. ofRehab. Corr. (1999), 133 Ohio App.3d 304, 311-312,727 N.E.2d 960; see, also, Ullmann v. State, Franklin App. No. 03AP-184, 2004-Ohio-1622. A party that fails to request Civ.R. 52 findings of fact faces "an almost insurmountable `mountain' in carrying the burden of establishing that a judgment is against the manifest weight of the evidence * * *." Pettet v. Pettet
(1988), 55 Ohio App.3d 128, 130, 562 N.E.2d 929. "As such, we must presume regularity in the proceedings below and affirm as long as there is some evidence from which the court could have reached the ultimate issue." In re Carter (Nov. 8, 1999), Butler App. No. CA99-03-49, citing Pettet,55 Ohio App.3d at 130, and Scovanner v. Toelke (1928), 119 Ohio St. 256,163 N.E. 493, paragraph four of the syllabus.
 {¶ 17} Here, the trial court did not issue factual findings or legal conclusions when denying Lynd's motion to quash the subpoena. The court generally found that Lynd's motion lacked merit and that she failed to demonstrate that Girdy's communication was privileged. Assuming that Lynd was representing Girdy on some matters, Lynd failed to prove that the statements she seeks to protect are connected with the matter for which she had been retained. Lynd did not subpoena Girdy to testify as to his beliefs regarding their communications and his inculpatory statement. She indicated she informed Girdy that she was contacting him on behalf of her client George Skatzes. Lynd indicated that Girdy sought her counsel in 1998 "unrelated to anything that we were doing for George Skatzes. He didn't ask us to try to get into what he did or didn't do. He was asking for enforcement of his plea agreement." During the 1998 interview Girdy sought legal help on the enforcement of the plea agreement, the right to refuse a polygraph, his possible placement in Administrative Control, Protection Control, and transfers to other in-state and out-of-state institutions. None of these requests and none of the services Lynd provided had anything to do with Girdy's culpability for uncharged misconduct during the riot.
 {¶ 18} In May of 2000 Girdy wrote Lynd to complain about conditions in prison. When she visited him to discuss this issue, she also renewed her efforts to obtain information about the Lucasville riots that would be helpful to Skatzes. The latter inquiry was not related to her professional relationship with Girdy but rather was designed to benefit Skatzes. No putative client could reasonably believe that statements Girdy made in this latter context would be used to advance his interest in any of the matters upon which Lynd was representing him. Moreover, the trial court reasonably could have concluded that Girdy inculpated himself to help Skatzes and knew that Lynd would disclose this information to third parties.
 {¶ 19} Because some evidence supports the court's decision that Girdy's communication was not privileged, the court's order directing Lynd to testify before the grand jury was lawful. When Lynd failed to obey this lawful order, the court had the discretion to find her in contempt. The record does not reveal anything to indicate that the court acted arbitrarily, irrationally or capriciously in doing so. Consequently, we affirm the trial court's judgment.
Judgment affirmed.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J. McFarland, J.: Concur in Judgment and Opinion.
[1] Lynd appealed both the court's judgment denying her motion to quash the subpoena and its judgment finding her in contempt. We have consolidated the two cases.