OPINION OF THE COURT
Lawrence N. Martin, Jr., J.
This is a contested adoption proceeding involving a baby boy born to an unwed mother on December 9,1981. Several months prior to the birth the mother informed her doctor that she would like to place the child for adoption in a caring Roman Catholic home. During that office visit she spoke with the attorney who continues to represent her. The doctor contacted a young childless Roman Catholic couple interested in adopting a child, and preliminary arrangements were made for the adoption. The natural mother who was a senior in college and living at home had not disclosed to her parents that she was pregnant. She had decided that before anyone in her immediate family discovered her condition, she would leave town, then have the baby, turn the baby over for adoption and return home and resume her education as though nothing had ever hap *131 pened. Pursuant to this plan the prospective adoptive parents arranged for her to board with a woman who would care for her during the latter stages of her pregnancy. The prospective adoptive parents agreed to and did pay for her living expenses during this period in addition to her medical and hospital expenses. They also agreed to pay for her adoption-related legal expenses.
On December 11, 1981, the natural mother executed the first of two consents to the adoption and on December 12, 1981, the prospective adoptive parents took custody of the child and he has been living with them ever since. On January 20, 1982, the natural mother executed a second consent to the adoption, on the official Surrogate’s Court form. On February 3, 1982, in response to her attorney’s request she arranged for transfer of the child’s birth certificate to the petitioners. On March 24, 1982, the adoption proceeding was instituted by the filing of the petition and supporting documents in the Surrogate’s Court. On or about March 30,1982, the court received a notice of revocation of adoption from the natural mother and on or about April 5, 1982, the petitioners filed a notice of intention to contest the revocation of consent. Issue having been joined the court communicated with the parties and they agreed to co-operate in an investigation which was then conducted by the Probation Department. The proceeding then came on for trial before the undersigned as acting Surrogate.
The evidence adduced at trial established that the petitioners are a loving couple who are dedicated and devoted to each other and to the child. The arrival of a child in their lives was the answer to their prayers and to their dreams and there is no doubt that they have the capacity and the determination to make a fine home for the baby boy. The three of them have already established a close and loving family bond. The natural mother is a mature, intelligent, well-educated young adult who independently reached a decision to place the child for adoption. After having surrendered the child and having signed the consent forms she then disclosed all of the facts to her father and other members of her family. It was only then that she changed her mind and decided to revoke her consent. She presently resides with her parents in the family home. If the child is *132 returned to the respondent, her mother, and her married sister who lives close by, will help to care for and raise the child in the family setting during those periods when she is away from home pursuing her education. She is a good student and upon completion of her undergraduate work she would like to continue her education and perhaps go on to law school.
Revocation of a consent is governed by section 115-b of the Domestic Relations Law which in pertinent part provides that the court shall: “take proof as to whether the best interests of the child will be promoted by the return of the child to the parents, or by the adoption of the child by the adoptive parents, or by placement of the child with an authorized agency for foster care with or without authority to consent to the adoption of the child, or by other disposition of the custody of the child.”
The statute further provides, as if to further emphasize and resolve any possible ambiguity concerning the “best interest test” that: “In such proceeding the parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents, notwithstanding that the parent or parents who consented to the adoption are fit, competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition.”
The foregoing provision is virtually identical to subdivision 5 of section 383 of the Social Services Law which governs agency adoptions. As pointed out by petitioners’ counsel, the best interests test was recognized many years ago by the Court of Appeals in Finlay v Finlay (240 NY 429) in a decision by Judge Cardozo, wherein he stated (pp 433-434), that in a custody proceeding the court acts as “parens patriae to do what is best for the interests of the child. He is to put himself in the position of a ‘wise, affectionate and careful parent’ * * * and make provision for the child accordingly * * * Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child.”
*133 The natural mother asserts that section 115-b of the Domestic Relations Law is not applicable in this case for the following reasons:
1. The “Irrevocable Consent” signed on January 20, 1982, is defective.
2. The statute is in violation of both the New York and the United States Constitutions in that it deprives her of her fundamental right to custody of her child without duo process of law.
3. The court may not determine the best interests of the child until it first finds the natural mother to be “unfit.”
In a private placement adoption such as in this case, the natural parent(s) may sign either a judicial or an extrajudicial consent. The judicial consent becomes irrevocable immediately, whereas an extrajudicial consent, if it shall so state, becomes irrevocable 30 days after commencement of the adoption proceeding. (Domestic Relations Law, § 115-b, subd 1.) The consent executed by the natural mother is on the official form and it provides as follows: “I xxx do hereby irrevocably Consent to the Private Placement Adoption of my son xxx. I understand that in the event that this Consent is not executed before a Judge of the Surrogate’s Court of the County of Westchester, then and in that event this Consent shall become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall be received by this Court within said thirty days.” A lay person, or for that matter even a lawyer who was not familiar with the provision of section 115-b of the Domestic Relations Law, could easily infer from the language of the form that where the consent was not executed before a Judge it could be revoked and upon revocation the parties would be restored to a status quo position. However, the form obviously must be read in conjunction with the governing statute, and when this is done it is clear that upon revocation the child is not automatically returned to his natural parents. The natural mother asserts that when she executed the consent she was under the impression that if she changed her mind she could still revoke it and have the child returned to her. The evidence adduced at the trial *134 does not support her position. At the time she executed the consent and at all stages of this proceeding she was represented by competent counsel. In fact her own personal attorney, who incidently still represents her in this proceeding, acted as notary public and took her acknowledgment on the consent executed by her on January 20, 1982. She did not testify as to the advice which she received from her attorney or as to any questions which she asked him or any answers which he gave her prior to signing the consent. The total absence of any testimony either by her or by her attorney with respect to this vital subject coupled with the absence of any evidence as to representations made to her by the petitioners or their attorney leads the court to conclude that there is no substance to the argument that she was misled by the language contained in the consent. Under different circumstances, and particularly where the consent is signed by an infant or a person not represented by an attorney, the argument would have far greater force. Since as the court stated in Dennis T. v Joseph C. (82 AD2d 125, 129), “The integrity of this process is an absolute necessity”. The surrender of such important rights to be valid must be voluntarily, knowingly, and intelligently made. (Cf. Matter of Jason ZZ, 79 AD2d 737; Matter of Anonymous [G.], 89 Misc 2d 514; Anonymous v Anonymous, 108 Misc 2d 1098.) The official form should be revised so as to eliminate any possibility of a natural parent being deceived on the one hand, or on the other hand being in a position to attack the consent by claiming that he was deceived. In this case, the court is satisfied that no deception was practiced on the natural mother and that she understood the consequences of her act when she executed the consent.
Respondent contends that section 115-b of the Domestic Relations Law deprives her of the fundamental liberty to raise her child. She relies on Santosky v Kramer (455 US 745), which held that the “fair preponderance of the evidence” standard in a parental rights termination proceeding violates the due process clause of the Fourteenth Amendment. It is appropriate that an involuntary, State-initiated action be strictly circumscribed. There must be *135 “clear and convincing” proof of parental neglect before the State may extinguish the parent-child relationship.
The situation in Santosky differs substantially from the case at bar. In an involuntary termination of parental rights, the State invades the privacy of the family and initiates a proceeding that may permanently remove a child from his or her parental care. In contrast, an adoption commences with a voluntary consent by the natural parent. The purposes and procedures of the two processes are different. Thus when New York conformed its statutes to the Santosky ruling, it did not amend the adoption statute, section 115-b of the Domestic Relations Law, but did amend procedures for finding parental neglect and determining custody and guardianship where such neglect is found. (L 1982, ch 123, amdg Social Services Law, § 384-b, subd 3, par [gj; Family Ct Act, § 622.)
Despite the differences between the situations in Santosky and the instant case, the due process analysis used in Santosky is useful here. In Santosky, the Supreme Court used the balancing test of Mathews v Eldridge (424 US 319, 335) which weighs three factors:
(1) The private interests affected by the proceeding;
(2) the risk of error created by the State’s chosen procedure; and
(3) the countervailing governmental interest supporting the use of the challenged procedure (Santosky v Kramer, 455 US- 745,_, supra).
Only the first of these factors is similar in proceedings for adoption and termination of parental rights. The private interest affected is the “parent’s right to raise his child * * * a fundamental liberty enjoying constitutional protection (Quilloin v Walcott, 434 US 246 * * *)”. (Matter of Sylvia M., 82 AD2d 217, 232.) In Santosky this factor was deemed “commanding,” and it is no less important here. The second and third Eldridge factors must be weighed differently in the case at bar than they were in Santosky.
Santosky found a substantial risk of error in New York’s procedure for termination of parental rights. An inequality of resources usually occurred, because the “State’s ability *136 to assemble its case almost inevitably dwarfs the parents’ ability to mount a defense.” (Santosky v Kramer, 455 US 745,_, supra.) There is no such inequality in the case at bar. The statute governing this procedure places the respondent and petitioner on equal footing, and both are private parties represented by counsel.
The consent mechanism of section 115-b of the Domestic Relations Law was carefully designed to protect and balance the interests of the natural parent and the prospective adoptive parents. (NY Legis Ann, 1972, pp 202-203.) If a natural parent gives timely notice of intent to revoke consent, the interested parties must follow the specific provisions of section 115-b (subd 3, pars [b], [d]) of the Domestic Relations Law. These procedures, with requirements of adequate notice, a precise timetable, and the supervision of the court, are not subject to the inequitable distribution of power that the Santosky ruling found objectionable.
Santosky addressed the issue of judicial discretion. Given the unequal array of resources in a parental rights termination proceeding, the Judge might be unduly influenced by the evidence presented by the State. The Supreme Court also noted that such proceedings are “unusually open to the subjective values of the judge” and because the parents “are often poor, uneducated, or members of minority groups * * * such proceedings are often vulnerable to judgments based on cultural or class bias” (Santosky v Kramer, 455 US 745,_, supra, citing Smith v Organization of Foster Families, 431 US 816, 833-835.) The opportunity for this type of abuse of discretion does not exist in the case at bar.
The court does have discretion to determine the best interests of the child, without the constraints of a presumption that the interest of either the natural parent or the adoptive parents must be promoted. “[T]he parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents”. (Domestic Relations Law, § 115-b, subd 3, par [d], cl [v].) Thus both parties are in a position secondary to the subject child, who is the proper focus of this determination.
*137 The third Eldridge factor is the countervailing governmental interest supporting the use of the challenged procedure (Mathews v Eldridge, 424 US 319, 335). Santosky found this factor “comparatively slight” because the proposed change in the procedure for termination of parental rights would not adversely affect the State’s interest. The adoption of a “standard of proof more strict than preponderance of the evidence is consistent” with the State’s interests. (Santosky v Kramer, 455 US 745,_, supra.) In contrast, in the case at bar the third Eldridge factor is substantial. The integrity of the adoption process is at stake. The State as parens patriae has an interest in the well-being of adoptive children and their prospective adoptive families. After the Scarpetta adoption case, the State established specific legal rights for prospective adoptive parents. The sponsor of section 115-b of the Domestic Relations Law explained that one purpose of the legislation was to give peace of mind to adoptive parents.
“The uncertainty under which the adoptive parents are now required to live cannot but adversely affect the relationship between them and the child during the period prior to * * * adoption * * *
“This bill is designed to correct the weakness of the law and introduce certainty in an area where certainty is required when dealing with the strongest of all human feelings — the relationship of mother and child.
“The broad damage that was done by the recent cases was to strike terror in the hearts of prospective adoptive parents and actually discourage other parents from entertaining adoption.” (Memorandum of Assemblyman Joseph R. Pisani, NY Legis Ann, 1972, p 203.)
Prospective adoptive parents now have a legal right to receive notice and to intervene when a natural parent files an intent to revoke consent to adoption. (Domestic Relations Law, § 115-b, subd 3, pars [b], [d].) The State has an overriding interest in maintaining the statutory scheme.
The challenged statute for private placement adoption passes the Eldridge test. The fundamental liberty interest of the natural parent, although “commanding,” must be weighed against the substantial governmental interest in *138 the integrity of the adoption process. The critical issue here is the risk of procedural error under section 115-b of the Domestic Relations Law. The court finds that in the instant case the statute provides appropriate safeguards for the natural mother and that she has not been deprived of due process.
Respondent contends that the court must follow the procedures of a parental rights termination, a two-step process beginning with a fact-finding hearing, followed by a “dispositional hearing” to determine custody. This argument was used in Matter of Anonymous (101 Misc 2d 169, 170), where the petitioner contended that the “standard in Matter of Bennett v Jeffreys * * * has changed the entire field of adoption and custody.” According to that standard, the court must first find (p 171) “surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody or extraordinary circumstances” before it could inquire into the child’s best interests. The court rejected that argument as “not supported by the law in this area. The standard in Matter of Bennett v Jeffreys (supra) is applicable in a custody proceeding, but not an adoption matter” (101 Misc 2d 170, 171; emphasis supplied). The respondent relies upon the case of Matter of Sanjivini K. (47 NY2d 374) in support of her argument that the rights of a natural parent are superior to those of prospective adoptive parents and that (p 382) “it is in the best interest of a child to be raised by his parents, unless the parents are unfit”. However, that case unlike the present one, involved a natural mother who had never consented to an adoption and who had never surrendered her child for adoption.
The instant case is a private placement adoption and is controlled by statute. “Adoption was unknown at common law and exists in this State solely * * * [by] statute * * * [S]trict construction of the adoption statutes is necessary.” (Matter of Anonymous, 101 Misc 2d 169, 171.) The statute, section 115-b of the Domestic Relations Law, does not require a primary finding of unfitness before a determination of the child’s best interest. On the contrary, it mandates a one-step process in the circumstances presented *139 here (Domestic Relations Law, § 115-b, subd 3, par [d], cl [i]).
Before the passage of section 115-b of the Domestic Relations Law in 1972, the courts had discretion to determine custody in the child’s best interest. A natural mother did not have an absolute right to revoke consent to adoption, for the decisional rule “never gave more than rebut-table presumptive status, however strongly, to the parent’s ‘right’.” (Matter of Bennett v Jeffreys, 40 NY2d 543, 548.) Legislation approved by the Legislature in 1971 provided a 30-day period when the natural mother would have had an absolute right of revocation; the Governor vetoed that statute because that provision might create a “detriment to the child’s best interests — and the court would be powerless to protect those interests fully” (NY Legis Ann, 1971, p 614). The statute signed into law in 1972 denies an absolute right of revocation and maintains the courts’ discretion to determine custody according to the child’s best interest. The legislative intent is clear, and the statute must be strictly construed.
In applying the best interests test the court makes findings as herein set forth:
The petitioners are both of suitable age for the rearing of a young baby and have been good and loving parents to the infant in the time they have had custody. As a result of the stimulating environment they have provided, the infant has grown physically, mentally, and emotionally beyond his chronological age, and a bonding has resulted between the infant and the prospective adoptive parents. Separation would result in some degree of emotional strain on the infant.
In keeping with the natural mother’s wishes the couple have had the infant baptized in the Roman Catholic faith and even take the infant to Sunday mass on a weekly basis. Their past conduct proves them to be superior parents and this court is convinced that if they are permitted to adopt the infant they will provide a stimulating, secure, and loving environment for the child.
The natural mother is unmarried and plans to raise the infant in her parents’ home. It was obvious from her *140 testimony that she has not given mature and full consideration to how she will provide for the infant. The grandparents who will provide most of the care of the child while the mother pursues her education are past the normal child-rearing age. The court is of the opinion that while the natural mother and grandparents would sincerely try to do their best for the infant, they cannot provide the stable environment provided by the prospective adoptive parents. The court further notes the absence of any testimony, or the appearance at court during the hearings, by the natural grandmother who would have much of the responsibility for rearing the infant.
At the hearings the court observed the prospective adoptive parents and the natural mother very closely in what was for all of them a very stressful situation. The court was impressed by the loving and supportive relationship between the adoptive parents. It feels that the natural mother loves the infant but that the overwhelming motivation for her seeking the return of the infant is her strong sense of duty to the infant and guilt of having given up her child.
This court feels that the natural mother, in giving the infant for adoption made a noble decision, in the best interests of her child which was most self-sacrificing. She should feel no guilt or remorse at that decision. It is our hope that her presence at the hearing has shown her what fine people she has given her child to and that she will be reassured by the facts she has learned.
It is the conclusion of the court that the best interests of the infant will be served by permitting the adoption to proceed. Therefore, the natural mother’s request to withdraw her consent to the adoption is denied.