OPINION OF THE COURT
Vincent J. Reilly, Jr., J.
The petitioner, Patricia Jean Tersigni, has filed a petition seeking a preadoption certificate from this court of an infant named Hermelinda Carballo born June 30, 1984. The petitioning papers presented to the court raised serious questions in the court’s mind as to the appropriateness of the placement *554 process as well as the fees being charged to the petitioner. Accordingly, a hearing was held on September 28, 1987 at which the petitioner and her attorney testified. At the hearing Robert Maslyn, Law Guardian assigned by the court, appeared on behalf of the child.
Ms. Tersigni, a single woman, who previously adopted a child from El Salvador through Schenectady County Family Court, testified that she decided to adopt a second child. She contacted one Susan Champney from Massachusetts who had been instrumental in assisting her during her first adoption. It is undisputed that Ms. Champney is not herself an authorized adoption agency nor is she a representative of an authorized agency. Ms. Champney referred Ms. Tersigni to Bernard J. Iacovangelo, an attorney licensed to practice law in New York who maintains offices in Rochester, New York. Mr. Iacovangelo was contacted in the fall of 1986 by the petitioner and she advised him that she wanted to adopt a child from Central America between the ages of 18 months and 3 years. A disclosure statement was forwarded to the petitioner which outlined the potential risks and fees of adopting a child from Central America. The petitioner then sent a social history and a retainer of $750 toward a fee of $2,000 to Mr. Iacovangelo.
During the initial phone contact the petitioner was advised by Mr. Iacovangelo that he knew an attorney in Guatemala who was able to obtain children for adoption and that his fee was $5,000. This fee, as an affidavit which was subsequently filed disclosed, was for room and board for the infant since May 14, 1987, legalization and translation of documents, medical expenses and court and notarial fees and expenses of some $2,300 with the balance being legal fees for the Guatemalan attorney, a Dr. Morales. Although the amount spent by Dr. Morales for room and board, etc., would vary depending on the circumstances of each case, the total fee of $5,000 charged by Dr. Morales to all such prospective adoptive parents did not vary. At the hearing Mr. Iacovangelo testified that Dr. Morales would refer proposed adoptive children to him which he would in turn refer to his clients. If the client chose to adopt the child referred, a $1,500 retainer would be sent to Dr. Morales, which would be applied toward the $5,000 fee. The balance would be due when the child left Guatemala. In May of 1987 Mr. Iacovangelo contacted the petitioner and advised her that the child, Hermelinda Carballo, was available for adoption, forwarding a picture of the child. He testified that he had contacted other clients concerning this child prior *555 to contacting Ms. Tersigni, hoping to have Hermelinda and her sister, who was coincidently also freed for adoption, adopted by the same family. Failing in this attempt, Mr. Iacovangelo contacted Ms. Tersigni. Fifteen hundred dollars of Dr. Morales’ fee of $5,000 was forwarded, and in May of 1987 he, as the attorney-in-fact, for Ms. Tersigni, commenced adoption proceedings in Guatemala which resulted in a decree of adoption on July 21, 1987. In the Guatemalan adoption proceedings Dr. Morales signed the consent to adoption on behalf of the natural mother and it appears from his financial affidavit as well as Mr. Iacovangelo’s testimony that he has provided for the foster care of the child from May 14, 1987 to the present.
Although the petitioning documents initially filed with this court were inartfully drawn, undated, unverified, and incomplete, this is not the focus of the court’s concern in this proceeding. As previously stated the focus of concern is the appropriateness of the placement. Secondarily, the court is concerned over the appropriateness of the fees charged. This court believes that the method of placement testified to and utilized in this proceeding was violative of the Social Services Law and contrary to the expressed public policy of this State.
Section 374 (2) of the Social Services Law provides: "No person, agency, association, corporation, institution, society or other organization except an authorized agency shall place out or board out any child but the provisions of this section shall not restrict or limit the right of a parent, legal guardian or relative within the second degree to place out or board out a child.”
Section 371 (12) of the Social Services Law defines "Place out” as follows: " 'Place out’ means to arrange for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care”.
Prior to the enactment of what has become sections 374 (2) and 371 (12) of the Social Services Law, the Special Committee on Social Welfare of the Joint Legislative Committee on Interstate Cooperation reported on the adoption process, recommending certain legislative changes to halt what the Committee perceived to be trafficking in babies, black market babies or bootleg placements. Under the law as it existed prior to the enactment of the present section 374 (2) intermediaries *556 were allowed to place children acting on behalf of a parent or guardian. In the Report of the Committee filed in 1949 (1949 NY Legis Doc No. 62, at 55) the Committee could "see no justification for permitting trafficking in babies” and declared that "fees paid or received in consideration of the placement of babies in foster homes should be prohibited”. The Committee recommendations in bill form were "aimed at persons engaged in buying and selling babies on a more or less commercial scale” (1949 NY Legis Doc No. 62, at 56). From this declared legislative intent came section 374 (2). That statute, by its express terms, prohibits placement of children by intermediaries, except authorized agencies, parents, legal guardians or relatives within the second degree. Although the legislative history indicated that the primary concern was intermediaries who profited financially from such arrangements, the statute itself prohibits all such intermediary placements, whether they be for profit or wholly benevolent. The receiving of fees for such activities is further prohibited and may result in criminal sanctions (Social Services Law § 374 [6]; §389 [2]).
This public policy has been fostered and encouraged by the courts of New York. Judge Gelfand writing in Matter of Juan P. H. C. (130 Misc 2d 387 [Sur Ct, Bronx County 1985]) referred to the "strong public policy of this State against sanctioning or facilitating the 'sale’ of children for adoption in what may become a marketing in human beings.” (See, Matter of Jose L., 126 Misc 2d 612 [Fam Ct, Queens County 1984].) The Attorney-General of New York in his opinions of 1975 also interpreted these statutes as prohibiting the trafficking in babies (1975 Opns Atty Gen 26). The activities proscribed are not only the physical delivery of a child for the purpose of adoption but also the arrangement for placement even though those arrangements are made with persons located outside of New York State.
In concluding that the activities of the attorney in this case are in violation of the Social Services Law this court is not unmindful of the Court of Appeals decision of People v Scopas (11 NY2d 120 [1962]). For the following reasons, however, this court is convinced that the majority holding is not controlling in the present case. As pointed out in Scopas (supra), criminal statutes must of necessity be narrowly and strictly construed. With this proposition the court does not disagree. In a civil case such as this, however, the focus of the court is on the integrity of the adoption process and assuring that the public *557 policy of this State, as that policy has been enunciated by the Legislature, is carried out. The legislative history and very wording of Social Services Law §§ 374 and 371 indicate clearly to this court that the act of arranging for a child to be placed in a family other than his birth family is prohibited, unless those arrangements are effectuated by persons or entities specifically authorized. The reality that arrangements and a linkup between child and adoptive parent have been done by one not authorized by statute is not cured by the fact that the child, at the time of actual entry into this country, may have been adopted abroad. In order to best carry out the legislative intent in this civil proceeding, the reasoning of the dissent in Scopas (supra) is adopted by this court and is followed.
A review of the facts clearly establishes that contrary to law and the public policy of the State, Mr. Iacovangelo has been instrumental in the placement of this child. Absent his activity the petitioner never would have known of the existence of this child. Although not an authorized agency Mr. Iacovangelo acted as an intermediary and aggressively sought an adoptive family for this infant knowing he would earn a fee. That his conduct is a commercial enterprise cannot be disputed since by his own testimony he has been engaged in at least eight other such foreign adoptions. In fact, the testimony of Mr. Iacovangelo was that he has hired a Spanish-speaking person for his office staff expressly for the purpose of assisting with these adoptions.
The quandary for the court is how to fairly deal with these statutory violations. The petitioner is clearly an appropriate adoptive parent, who has made a strong emotional commitment to this child, sight unseen. To deny her petition because the court has concluded that her attorney has violated the Social Services Law would penalize a person who has done no wrong and acted in good faith. To grant the petition without reservation or sanction would be a breach of the court’s duty.
The courts of this State have the authority to supervise the charging of fees for legal services under the court’s inherent and statutory powers to regulate the practice of law. (Gair v Peck, 6 NY2d 97; Domestic Relations Law § 115 [7]; Social Services Law § 374 [6]; Matter of Anonymous, NYLJ, June 17, 1985, at 17, col 3 [Sur Ct, Westchester County]; Matter of Male Infant M.M., NYLJ, Aug. 28, 1987, at 12, col 1 [Sur Ct, Nassau County].) In the instant case the court has no actual and practical ability to regulate the fees of Dr. Morales, some of which are questionable and appear excessive. Traditionally, *558 the reasonableness of fees are measured in terms of the time spent, the difficulties involved in the matter, the nature of the services and the professional standing of the attorney. From Mr. Iacovangelo’s testimony he has spent over 20 hours in this matter and the matter is, by his testimony, extraordinary because of the court’s inquiry about the placement process. The court has every reason to believe that his professional standing is good, but the court cannot condone his utter disregard of the Social Services Law and the stated public policy of this State against trafficking in babies.
Accordingly, this court will grant the application for a preadoption certificate. Mr. Iacovangelo is directed to reimburse the petitioner for all fees, and disbursements paid to date and he is prohibited from rendering any bill for services and disbursements in these proceedings as yet unpaid. A receipt signed by the petitioner acknowledging the refund of fees and disbursements shall be filed with this court no later than 30 days from the date of this decision.