[660 NYS2d 916]

In the Matter of the Adoption of JARRETT. JILL H. et al., Appellants; KAREN DOE et al., Respondents. (Appeal No. 1.)

Fourth Department, May 30, 1997

514

APPEARANCES OF COUNSEL

*Patricia M. McGrath,* Lockport, for Jill H., appellant.

*Gilman, Schneider & Komissaroff,* New York City *(Carol Komissaroff* of counsel), for Steven J., appellant.

*Phillips, Lytle, Hitchcock, Blaine & Huber,* Buffalo *(Alan M. Wishnoff* and *Lisa Smith* of counsel), for Dennis Doe and another, respondents.

*James S. Hinman, Law Guardian,* Rochester, for infant.

### OPINION OF THE COURT

BOEHM, J.

This matter is again before us after remittal to Family Court for a best interests hearing *(Matter of Jarrett,* 224 AD2d 1029, *lv dismissed* 88 NY2d 960) and the completion of that hearing. At issue is the adoption of a child, Jarrett, who was born to the birth mother in Pennsylvania on April 6, 1995. Jarrett was placed in the custody of the adoptive parents by the birth mother the day after he was born and he has lived with them since then.

On the prior appeal we determined that the birth mother's consent to the adoption was valid and that the birth father had made no effort to "assert his parental interest during the critical six-month period before the placement of the child for adoption, and thus had no constitutionally protected interest" to enable him to veto the adoption *(supra,* at 1031-1032). We further held that the Niagara County Family Court had personal jurisdiction over the birth mother and birth father.

Upon remittal, Family Court held a hearing to determine the best interests of the child, pursuant to Domestic Relations

Law § 115-b. Neither the birth father nor the birth mother have challenged the court's findings of fact or its conclusion that Jarrett's best interests are served by his adoption. Instead, they have raised a multitude of constitutional and jurisdictional contentions, some of which had been previously addressed. For example, we held that, by her execution of the extrajudicial consent, the birth mother agreed that revocation within 45 days would entitle her at most to a best interests hearing. She also signed a waiver of citation and consent to the adoption and an acknowledgement that the child was being adopted in New York, that her rights would be terminated under New York law and she waived any rights under Pennsylvania law to revoke her consent or contest the adoption in a court of Pennsylvania. Further, both the birth mother and birth father participated in the best interests hearing.

## I

The birth father in this appeal raises the issue that Family Court lacked subject matter jurisdiction over the adoption proceedings. The birth father further contends that the violation of his due process rights in the Commonwealth of Pennsylvania, where the child was born and where the birth father resides, affects the legality of the adoption proceeding, as well as this State's jurisdiction. The issue of subject matter jurisdiction was also raised in the earlier cross appeal by the birth mother and rejected without discussion. An objection to subject matter jurisdiction is neither waivable nor curable by consent, estoppel or laches, and it may be raised at any time (*see, Matter of Axelrod v Sobol*, 180 AD2d 905, 906; Siegel, NY Prac § 8 [2d ed]). We, therefore, now address the jurisdiction arguments.

■ Relying upon the provisions of the Interstate Compact on the Placement of Children (Interstate Compact), adopted in New York and codified in Social Services Law § 374-a, the birth father contends that New York has been deprived of jurisdiction over the subject of this adoption proceeding. Pennsylvania has also adopted the Interstate Compact (62 Pa Stat Annot § 761). In support of his contention, the birth father sought to include in the record on appeal an April 21, 1995 letter from the Pennsylvania Interstate Compact agency to New York, which purports to rescind Pennsylvania's initial approval of Jarrett's placement for adoption in New York. The birth father failed to offer that letter in evidence at the best interests hearing and Family Court denied his motion to include the letter

in the record. There is, however, a document in the record from the New York State Department of Social Services addressed to the Pennsylvania Interstate Compact agency that indicates that, on April 21, 1995, the Pennsylvania agency requested that New York rescind its approval of Jarrett's placement in this State. However, even assuming that such a request was made, New York's subject matter jurisdiction of the adoption proceeding was not affected.

Although the Interstate Compact regulates placement for adoption, that is by no means its primary purpose. As observed by the Court of Appeals, "[t]he Interstate Compact was designed to prevent States from unilaterally 'dumping' their foster care responsibilities on other jurisdictions" (*Matter of Shaida W.*, 85 NY2d 453, 459). The objectives of the Interstate Compact are "to (1) ensure adequate and maximum opportunity of care for children; (2) promote cooperation between States by providing receiving States with complete information and a full opportunity to assess the situation before deciding whether to undertake the responsibility (*see*, Mem of Joint Legis Comm on Interstate Cooperation, Bill Jacket, L 1960, ch 708); and (3) preclude sending States from 'dumping' their responsibility for children on receiving States without a legally reliable authentication chain (*see*, Compact Administrator's Manual, at 3.90)" (*Matter of Shaida W., supra*, at 461). The focus of the Interstate Compact is to limit the interstate shifting of the economic burden of child care without the prior cooperative agreement between the "sending" and the "receiving" States. Obviously, that focus becomes less predominant when a child is brought to the receiving State for the purpose of adoption because the adoptive parents will be responsible for the care of the child.

Article V (a) of the Interstate Compact sets forth the conditions under which jurisdiction over the child to determine matters such as custody is retained. It provides: "The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law" (Social Services Law § 374-a [1], art V [a]).

"Sending agency" includes "a person, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state" (Social Services Law § 374-a [1], art II [b]). "Receiving state" is defined as "the state to which a child is sent, brought, or caused to be sent or brought" (Social Services Law § 374-a [1], art II [c]).

The Interstate Compact further requires that the "sending agency" comply with the conditions for placement found in article III, including the furnishing of certain information to "the appropriate public authorities in the receiving state" (Social Services Law § 374-a [1], art III [b]). Article III further provides that a child shall not be sent or brought into the receiving State "until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child" (Social Services Law § 374-a [1], art III [d]). In New York, the Department of Social Services is the "appropriate public authorit[y]" (Social Services Law § 374-a [4]).

The Pennsylvania Interstate Compact Placement Request (form 100A) was signed by the birth mother on April 10, 1995, and by the Pennsylvania Interstate Compact Administrator on April 13, 1995. The Placement Request was sent to the New York Interstate Compact Administrator and executed by her on April 18, 1995, signifying approval of Jarrett's placement in New York. The birth father does not contend that the "public authorities" in Pennsylvania and New York were not properly notified by the birth mother of her intentions concerning Jarrett or that he was not properly identified as Jarrett's birth father, nor does he contend that the adoption laws of New York were somehow violated by bringing Jarrett into this State. Although form 100A does not identify the birth father, the record reflects that both of the Interstate Compact agencies were notified of his identity as the birth father. Thus, the adoptive parents and the birth mother complied with the mandates of the Interstate Compact in obtaining authorization from Pennsylvania and New York for Jarrett's removal to New York. Thereafter, on May 2, 1995, Niagara County Family Court granted temporary guardianship of Jarrett to the adoptive parents.

Having authorized the removal of Jarrett to New York, Pennsylvania was no longer in a position to rescind its decision that the conditions for placement under the Interstate Compact

were satisfied. "The interstate Compact establishes conditions precedent to a subject child's establishment of residence in the receiving State, and compliance with article III is determined in the sole discretion of the receiving State" (*Matter of Tsapora Z.*, 195 AD2d 348, 349).

Further, pursuant to article V of the Interstate Compact, which provides for retention of jurisdiction, jurisdiction is retained not in the sending State but in the "sending agency." Here, the "sending agency" is the birth mother. She was so designated in form 100A and she executed that form as the "sending agency" for the very purpose of obtaining New York's approval to receive Jarrett there. Although verbal approval by the New York Interstate Compact Administrator preceded her written approval and Jarrett was removed to this State after the verbal approval, there is no dispute that approval was given by both agencies after having been supplied with the requisite information, and that the necessary written approval was executed shortly thereafter.

One court has held that in a private placement adoption, where the adoptive parents were appointed temporary guardians prior to adoption, the Interstate Compact does not apply (*Matter of Baby Boy O. G.*, 145 Misc 2d 746 [referring to Social Services Law § 374-a (1), art VIII (a)]), but we choose to address the issue of jurisdiction without resolving that possibility. Here, the birth mother, as the sending agency, executed valid consents to the adoption. Such consents constituted the exercise of the power "to effect or cause the return of the child or its *transfer to another location and custody pursuant to law*" (Social Services Law § 374-a [1], art V [a] [emphasis added]). In *Adoption of Zachariah K.* (6 Cal App 4th 1025, 1038, 8 Cal Rptr 2d 423, 431 [Ct App 2d Dist]), involving a similar factual situation, the California court held that the birth mother, having executed the necessary consents, thereby effected or caused the child's transfer to Oregon, the receiving State, and to that State's jurisdiction. Although the Interstate Compact provides the sending agency with jurisdiction until the child is adopted or is discharged, the *Zachariah K.* court, in determining that jurisdiction was in the receiving State, applied that portion of the jurisdictional provision of the Interstate Compact that, as already noted, provides: "Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law" (Social Services Law § 374-a [1], art V [a]).

That view of the transfer of jurisdiction was also adopted in *J. D. S. v Franks* (182 Ariz 81, 94, 893 P2d 732, 745). There, the

Supreme Court of Arizona stated: "Recent authorities have followed *Zachariah K.* and interpret the ICPC provision regarding the sending agency retaining jurisdiction as follows: '[T]his ICPC provision does not preclude the sending agency from transferring its responsibility to some other entity in the receiving state, including the prospective adoptive parents * * *' Hollinger, 1 Adoption Law, § 3-A.11, at 99 (Supp. 1994)" (182 Ariz, at 94, 893 P2d, at 745).

Because it facilitates the enlightened policy of New York to achieve early stability in adoptions, we adopt the same construction of the Interstate Compact. Therefore, by executing valid consent documents, the birth mother, as the sending agency, transferred both the child and jurisdiction to New York.

Lastly, although article IV of the Interstate Compact provides a penalty for placement in violation of its provisions, such penalty does not include the loss of jurisdiction of the receiving State. The courts of this State have ignored such violations where it was in the best interests of the child to do so (*see, Matter of Tersigni [Carballo]*, 137 Misc 2d 553; *Matter of Baby Boy M. G.*, 135 Misc 2d 252; *Matter of Baby E.*, 104 Misc 2d 185). In any event, no penalty would attach here because the Interstate Compact was not violated. In fact, the adoptive parents made every effort to comply, waiting in Pennsylvania until approval was received from both the Pennsylvania and New York Interstate Compact agencies. It was only after receiving approval that the adoptive parents took Jarrett with them to New York.

Under the circumstances, Pennsylvania may not retroactively rescind its approval for Jarrett's placement in New York.

Approximately two weeks after the adoption proceeding was commenced in New York, the birth parents commenced a custody proceeding in the Court of Common Pleas of Westmoreland County, Pennsylvania, by obtaining an ex parte order of temporary custody from that court. The Court of Common Pleas subsequently issued temporary orders granting custody to the birth parents, the last one on January 29, 1996, after our decision directing that a best interests hearing be held. In our view, Pennsylvania no longer had jurisdiction when those orders were issued and, therefore, the Full Faith and Credit Clause is not implicated. Further, full faith and credit need not be given to a foreign judgment that is not final under that State's laws (*see, Matter of Pearson v Pearson*, 69 NY2d 919). Parenthetically, we add that we disagree with the Pennsylvania

court's construction of the Interstate Compact and point out that the Uniform Child Custody Jurisdiction Act, as enacted in New York (Domestic Relations Law art 5-A), unlike Pennsylvania, specifically excludes "proceedings for adoption" (Domestic Relations Law § 75-c [3]).

We also take note of the decision of the United States District Court for the Western District of Pennsylvania that was rendered after an action was commenced there by the birth parents seeking to obtain custody of Jarrett and claiming a violation of their constitutional rights (*Birth Parents v Adoptive Parents* [title changed from original], US Dist Ct, WD Pa, 96 Civ 205, June 13, 1996, Lee, J.). The birth parents argued, as they have in this proceeding, that Jarrett's custody is governed by the orders of the Pennsylvania Court of Common Pleas. The District Court concluded that the custody of Jarrett should be decided by the courts of New York and granted the motion of the adoptive parents for summary judgment.

For the foregoing reasons we conclude that New York, and more particularly Niagara County Family Court (the county of residence of Jarrett and the adoptive parents), at all times had subject matter jurisdiction over this adoption proceeding.

## II

We have previously considered and rejected the contention of the birth father that he is a "consent" birth father and has a constitutionally protected interest in retaining custody of Jarrett. We determined that he has rights as a "notice" father, and, as such, does not have a constitutionally protected interest. Under the Domestic Relations Law he is entitled only to notice and an opportunity to participate in a best interests hearing (*see*, Domestic Relations Law § 111-a).

We reject without discussion the birth father's assertion that the New York Constitution limits Family Court's subject matter jurisdiction to those adoptions only that involve children born in this State and that New York courts lack subject matter jurisdiction in any dispute between New York residents and a nonresident (*see, Matter of Female Infant F.*, 191 AD2d 437, 438).

With respect to the birth father's due process challenge, the Supreme Court has examined the extent to which an unwed birth father's biological link to a child receives constitutional protection and has concluded that a prompt manifestation of paternal responsibility toward the child is required to protect the constitutional right to custody or the

right to veto the adoption (*see, Lehr v Robertson*, 463 US 248, 267-268; *Caban v Mohammed*, 441 US 380, 392; *Quilloin v Walcott*, 434 US 246, 255-256, *reh denied* 435 US 918). In *Lehr v Robertson*, the Supreme Court sustained the constitutionality of Domestic Relations Law § 111-a, which provides for notice to unwed birth fathers, and upheld an adoption based on the best interests of the child. In addressing a birth father's liberty interest, the Supreme Court characterized "the rights of the parents [as] a counterpart of the responsibilities they have assumed" (*Lehr v Robertson, supra,* at 257). The Court upheld Domestic Relations Law § 111-a as a legitimate measure that balanced the desire of the putative father to accept responsibility for his child's future with the State's interest in promoting finality in adoption proceedings. The birth father's equal protection argument was also rejected.

The birth father's contention that the timetable established by the Court of Appeals in *Matter of Raquel Marie X.* (76 NY2d 387) is unconstitutional is without substance. There, the Court of Appeals declared Domestic Relations Law § 111 (1) (e) unconstitutional but further concluded that there was no constitutional infirmity in evaluating the interest of a birth father in being a parent based on his conduct in the six months preceding his child's placement for adoption (*Matter of Raquel Marie X., supra,* at 406). Subsequently, in *Matter of Robert O. v Russell K.* (80 NY2d 254), the Court of Appeals upheld against a challenge on due process and equal protection grounds the constitutionality of the six-month timetable and the requirement for unwed birth fathers to manifest parental responsibility promptly. The Court held that more than an assertion of custody is required in determining whether the birth father has a liberty interest. The birth father's attempt here to transform a mere opportunity to enjoy a custodial relationship with the child into a constitutionally protected right to custody was squarely rejected by the Supreme Court and our Court of Appeals (*see, Lehr v Robertson, supra*; *Matter of Robert O. v Russell K., supra*).

The language in *Matter of Robert O.* has equal application here: "Petitioner's argument confuses the meaning of the constitutionally protected 'opportunity' we recognized in *Raquel Marie.* The opportunity at issue there, and the one we found constitutionally protected, was the opportunity 'to develop a qualifying relationship with the infant' (*Matter of Raquel Marie X., supra,* at 401). That opportunity arose and became protected only *after* the father had manifested his

willingness to be a custodial parent. The opportunity petitioner seeks to protect is different and quite separate. It is the opportunity to manifest his willingness. No one, however, let alone any State actor, prevented petitioner from finding out about [the mother's] pregnancy. His inaction, however regrettable and with whatever unfortunate consequences, was solely attributable to him. Nothing in *Raquel Marie* or the Supreme Court decisions on which it rests suggests that the protections of constitutional due process must or should be extended to him under these circumstances" (*Matter of Robert O. v Russell K., supra*, at 265 [emphasis in original]).

Earlier, in *Matter of Raquel Marie X.*, relying on Federal constitutional law, the Court of Appeals held that "[t]he State can deny a right of consent to all unwed fathers who do not come forward to immediately assume their parental responsibilities, and it can prescribe conditions for determining whether the unwed father's manifestation of interest in his child is sufficiently prompt and substantial to require full constitutional protection [citation omitted]" (*Matter of Raquel Marie X., supra*, at 404). Domestic Relations Law § 111 (1) (d) promotes the legislative policy of encouraging the adoption of children "by limiting the necessity for paternal consent, thus making the process surer and speedier" (*Matter of Raquel Marie X., supra*, at 404).

Because the birth father failed to assert an interest in assuming his parental responsibilities promptly, we previously held that he could not veto the adoption. During the period of the birth mother's pregnancy, he was arrested for assaulting her; during that same period he was married to another woman and was living with a 17-year-old girl, whom he impregnated; although he saw the birth mother shortly before her delivery, he professed that he did not know that she was pregnant, a claim that lacked credibility; and he has yet to pay for her pregnancy or birth-related expenses.

The birth father's notion that his failure to assume parental responsibility prior to and after the birth of Jarrett is irrelevant to his primary right as the birth father to veto the adoption is not a view that we are prepared to recognize or accept.

## III

The birth father argues that the New York adoption statute violates due process because it does not require a finding that he is unfit as a parent. Although not specifically delineated below, we deem that argument included within the broad

constitutional issues raised by the birth parents in Family Court. In the context of adoption, however, that argument has no merit as the Supreme Court has upheld the constitutionality of adoptions granted pursuant to a best interests standard (*see, Lehr v Robertson, supra,* at 266-267; *Quilloin v Walcott, supra,* at 254). The Supreme Court cases cited by the birth father are either inapposite or consistent with the constitutionality of the adoption statute. Under the Illinois law in *Stanley v Illinois* (405 US 645), lack of fitness was the only basis for granting an adoption without parental consent. *Reno v Flores* (507 US 292) did not involve adoption and did not address the rights of birth parents as compared to adoptive parents. The birth father's reliance on *Caban v Mohammed* (*supra,* at 391) is similarly misplaced as that case did not address the propriety of applying the best interests standard and, indeed, declined to address the standards for unwed birth fathers. The cases from other States relied upon by the birth father are inapposite because of their different factual settings or statutory provisions.

*Matter of Bennett v Jeffreys* (40 NY2d 543), heavily relied upon by the birth parents, is also of no help to them. As the Court of Appeals emphasized, the case did not involve "an attempted revocation of a voluntary surrender to an agency or private individual for adoption" (*Matter of Bennett v Jeffreys, supra,* at 545). The proceeding was brought by an unwed mother to obtain custody of her daughter from a custodian to whom the child had been voluntarily entrusted by the mother's parents when the mother was 15 years old. Because no statute was directly applicable, the Court of Appeals held that common-law principles applied. Nevertheless, the Court was careful to point out that "[t]he day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right" (*Matter of Bennett v Jeffreys, supra,* at 546).

The Court went on to state that "[r]ecently enacted statute law, applicable to related areas of child custody such as adoption and permanent neglect proceedings, has explicitly required the courts to base custody decisions solely upon the best interest of the child [citations omitted]. Under these statutes, there is no presumption that the best interest of the child will be promoted by any particular custodial disposition. Only to this limited extent is there a departure from the pre-

existing decisional rule, which never gave more than rebuttable presumptive status, however strongly, to the parent's 'right' " (*Matter of Bennett v Jeffreys, supra,* at 547-548). It is appropriate to note that the "statute law" referred to included Domestic Relations Law § 115-b, which was held by the Court to conform "to constitutional limitations" (*Matter of Bennett v Jeffreys, supra,* at 548).

Nor is the principle of equal protection offended by relying on the birth father's prebirth conduct in determining his rights. The Equal Protection Clause requires equal treatment of persons similarly situated and does not prohibit dissimilar treatment of persons dissimilarly situated. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike" (*Nordlinger v Hahn,* 505 US 1, 10; *see, Romer v Evans,* 517 US —, —, 116 S Ct 1620, 1627; *Royster Guano Co. v Virginia,* 253 US 412, 415). Where a birth father fails to take responsibility for the child prior to placement, it is not difficult to see that the birth mother and the birth father are not similarly situated.

The cases relied upon by the birth father do not support his contention that his rights, as the birth father merit the same protection as the birth mother's rights. The birth mother is responsible for the child during pregnancy and her financial obligations arise immediately upon the child's birth. There is not the same responsibility with respect to the birth father; before paternity has been legally established he is not obliged to support the child. Further, the birth mother may without the consent of the birth father terminate her pregnancy (*see, Roe v Wade,* 410 US 113, *reh denied* 410 US 959). Given those differences and the purpose of New York's law, which is to promote early stability and to provide safe and secure homes for children, any difference in the treatment of a birth father and birth mother that is found in the Domestic Relations Law is rationally related to achieving that purpose and, therefore, any differential treatment does not violate equal protection (*see, Matter of Raymond AA. v Doe,* 217 AD2d 757, *lv denied* 87 NY2d 805).

The same principle applies with respect to unwed fathers. "That 'unknowing' unwed fathers may be treated differently under the statute than other unwed fathers is not dispositive", absent a showing of a lack of rationality in either the notice or consent provisions of the New York statute (*Matter of Robert O. v Russell K.,* 80 NY2d, *supra,* at 267). Such showing has not been made by the birth father.

Nor are unwed birth parents and adoptive parents similarly situated. *Matter of Baby Boy C.* (84 NY2d 91), cited by the birth father, does not deal with the rights of birth parents and adoptive parents in a contested adoption. The birth parents there were not seeking to contest the adoption. There, the only issue was whether revocation of consent to adopt after the adoptive parties divorced nevertheless compelled the carrying out of the adoption against the wishes of one of the parties. The Court of Appeals held that it would not impose a relationship that one of the parties found unacceptable, especially when the proper care and protection of the children's physical, emotional and mental well-being and the goal of placing the children in a stable home environment are such important considerations. The facts in that case are obviously not the same as the facts here, and that case lends no support to the birth father's equal protection argument. Further, under New York law, birth parents and adoptive parents have the same right to present evidence at a best interests hearing, with no presumption in anyone's favor. "The custody of [the] child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition" (Domestic Relations Law § 115-b [6] [d] [v]). The law gives no support to the birth father's concern that birth fathers who live in New York have greater rights than those who live outside of New York.

Thus, the birth father has failed to meet his burden of proving the statute's unconstitutionality, either facially or as applied, beyond a reasonable doubt (*see, Town of N. Hempstead v. Exxon Corp.*, 53 NY2d 747; *People v Lang*, 36 NY2d 366).

## IV

In assessing the claims advanced by the birth mother that her constitutional rights have been violated by these proceedings, it is again appropriate to call attention to the fact that it was she who set these proceedings in motion. She sought out the adoptive parents, informed them of Jarrett's birth, made the arrangements with the hospital for Jarrett to be taken from the hospital by the adoptive parents, executed the adoption documents and acknowledged their execution before a notary public. All this was done by her willingly, knowingly and voluntarily, without fraud, duress or coercion, and with the advice of counsel. While the birth parents characterize her execution of the adoption documents as "insubstantial" and as

a "fleeting" act, "[t]he law recognizes that consent implicates not only the very fundamental interests of birth parents, whose decision initiates the process, but also the child's substantial interests in a stable, continuous home environment, and those of third parties, the adoptive parents, who but for the consent would not have become involved" (*Matter of Sarah K.*, 66 NY2d 223, 233, *cert denied sub nom. Kosher v Stamatis,* 475 US 1108).

The fact that the birth mother lost the presumption of custody by voluntarily placing Jarrett for adoption does not offend constitutional principles (*see, Matter of Daniel C.,* 115 Misc 2d 130, *affd* 99 AD2d 35, *affd* 63 NY2d 927). The birth mother's contention that she has been denied due process by having to proceed in New York disregards her express consent to do so.

As with the birth father, the birth mother's contention that the best interests standard violates a birth parent's constitutional right to equal protection is without merit. That standard, rather, places "both parties * * * in a position secondary to the subject child, who [becomes] the proper focus of this determination" (*Matter of Daniel C.,* 115 Misc 2d, at 136, *supra).*

With regard to the birth mother's due process arguments, the Court of Appeals has recently noted that the procedural safeguards embodied in Domestic Relations Law § 115-b "reflect modern sensitivities as to the level of procedural protection required for waiver of parental rights" (*Matter of Jacob,* 86 NY2d 651, 665). While that case involved the ability of the homosexual partner of the child's birth mother to adopt the child, the Court of Appeals in arriving at its decision analyzed without voicing disapproval the various provisions of the Social Services Law and Domestic Relations Law, including the procedural requirements of Domestic Relations Law § 115-b as they apply to the adoption of children. A close reading of the birth mother's argument reflects that she does not take issue with the procedures established under that statute, nor does she contend, except in one limited respect, that the best interests hearing deprived her of her due process rights. She contends, rather, that because a poor, uneducated, unwed birth parent is not likely to prevail against married, educated, middle-class, older adoptive parents in a best interests hearing, the statute creates a de facto classification that is unconstitutionally discriminatory.

To begin with, this argument raises equal protection rather than due process concerns. Moreover, the birth mother's arguments that adoptive parents start out in a superior position

and that birth parents are presumed to be ambivalent toward a child who has been surrendered for adoption are meritless, inasmuch as the adoption statute specifically provides that there shall be no presumption that any particular disposition is in a child's best interests (*see*, Domestic Relations Law § 115-b [6] [d] [v]). Nor is there any merit to her contention that the statute encourages the taking of a child from its parent merely because of the parent's poverty. Her arguments presuppose that there was no formal manifestation of intent on her part that initiated the surrender of custody of the child. Further, the respective financial abilities of the parties, as well as the stability of the current custody arrangement, were proper matters of concern of the Family Court in reaching a best interests determination (*see, e.g., Matter of Sarah K., supra*, at 233).

The birth mother's contention that the same factors that militate against awarding custody to a birth parent are ignored with regard to adoptive parents is also without merit. In both *Matter of Michael JJ.* (200 AD2d 80) and *Matter of Donald U.* (105 AD2d 875, *lv dismissed* 64 NY2d 603), cited by the birth mother, the courts held that problems of the prospective adoptive parents that had been revealed through the adoption certification process had occurred several years prior to the application for adoption, and had been resolved. Further, in *Matter of Donald U.* the Court specifically found that the failure of the applicant to support the children from his previous marriage was a result of the mother's claim that the applicant was not their father (*Matter of Donald U., supra*, at 876). Neither those cases nor *Matter of Baby Girl W.* (151 AD2d 968, *lv denied* 74 NY2d 613), also cited by the birth mother, involved challenges by the birth parents to a finding that the placement of the child in the custody of adoptive parents, rather than with the birth parents, was in the best interests of the child. Those cases lend no support to the contention of the birth mother that she has been unconstitutionally deprived of the custody of her child solely based on her status as an unwed mother.

To the extent that the birth mother argues that a hearing in this State fails to adequately protect her interests because she was denied the opportunity to present witnesses on her behalf, Family Court did not limit her opportunity to present witnesses or to fully develop the record. The court suggested that, if the birth mother's witnesses were financially unable to travel to New York to testify, the proceeding might be moved to one of the counties bordering on Pennsylvania and raised the pos-

sibility of renting a bus to transport her witnesses. Counsel for the birth mother pointed out that a subpoena was needed to obtain the testimony of certain witnesses from agencies in Pennsylvania, but nothing was said whether witnesses were willing to provide affidavits or deposition testimony in the absence of a subpoena. The record reflects that the birth mother's counsel was successful in obtaining the consent of the Pennsylvania court to the release of records from the Westmoreland County Children's Bureau but that court refused to issue a subpoena to obtain the deposition testimony of any of the other witnesses. The record does not indicate that those witnesses were unable or unwilling to travel to New York to testify.

## V

There is nothing in the decision of Family Court to suggest that the court's evaluation of the evidence was based on the birth parents' status of their "ambivalence" toward Jarrett, or on anything other than the evidence. Similarly, nothing in the opinions of the experts who testified on behalf of the adoptive parents and the Law Guardian indicates that their recommendations were based on the birth parents' status or any "ambivalence" toward Jarrett. The court's best interests determination and its order granting the petition of the adoptive parents for the adoption of Jarrett is fully supported by the record.

At the time of the hearing, the birth mother was 22 years old. She became pregnant for the first time when she was 15 years old and was in the eighth grade. She dropped out of school at the beginning of the ninth grade. The birth mother's first child was born in July 1990 and was fathered by a man with whom she had a turbulent and abusive relationship. She testified that he beat her for hours with a dog chain in front of his mother, who did nothing to stop him. The birth mother nevertheless entrusted her child's care to the paternal grandmother and the father, in spite of the father's problem with alcohol and his use of cocaine. The birth mother became pregnant again by the same man; that pregnancy was terminated by an abortion in 1992. Her second child was fathered by a different man. Jarrett is the third of her three children, also fathered by a different man. She has never been married and the birth fathers have never supported either her or their children. The birth mother is unemployed and has no job history or skills. Since dropping out of high school, she has subsisted

on welfare and food stamps. She has admitted to marihuana and alcohol use, including the use of marihuana while pregnant with Jarrett. She continues to smoke cigarettes in her apartment, notwithstanding the fact that her oldest son suffers from asthma. Her children were taken from her for six weeks by the Children's Bureau, the Pennsylvania equivalent of this State's Child Protective Services, due to allegations of child abuse, drug use, selling food stamps and inadequate housing. A Pennsylvania court found those allegations sufficiently demonstrated that it directed the birth mother to undergo drug testing, and six months of alcohol, drug and parenting skills counseling.

The birth father was also 22 years of age at the time of the hearing. He dropped out of school in the tenth grade and testified that he is uninterested in completing his education. He was arrested for assaulting the birth mother while she was pregnant with Jarrett. The birth father admitted to having a problem forming close and trusting relationships, and Family Court referred to his instability in relationships with women. For example, while married to another woman, he impregnated the birth mother and during her pregnancy he had sexual relations with a 17-year-old, who became pregnant and had an abortion. The birth father's only real job since dropping out of high school has been employment by his brother, doing carpentry and construction. He testified that he does not know his annual earnings and admitted that he has never paid Federal or State taxes. Family Court's reference to the birth father's "lack of foresight and the inability to plan for the future in any realistic way" is amply demonstrated by the record.

Both birth parents have lived in nomadic fashion in numerous apartments and mobile homes during the four or five years prior to the best interests hearing. The birth mother has lived in about 13 places and the birth father in eight or nine. The testimony of the birth mother revealed the deplorable and totally unsuitable conditions of some of the mobile homes and apartments in which she has lived with her children. Family Court observed that her failure to provide adequate housing for the children was one of the reasons they were taken from her custody and placed in foster care for six weeks shortly before Jarrett was born.

The birth father has two criminal convictions, one for his violent assault on the birth mother, and the other for his assault on a neighbor of the birth mother. At the time of the best

interests hearing, the birth parents were neither married nor living together, nor had the birth father paid for any of the birth mother's pregnancy or birth-related expenses.

Family Court compared the unstable and irresponsible lifestyle of the birth parents with that of the adoptive parents, who "by all accounts have a stable, happy and successful marriage." At the time of the hearing, the adoptive mother was 32 years old. She is a college graduate who worked as a court reporter. Since the arrival of Jarrett, she has spent full time at home caring for him. The 30-year-old adoptive father is also a college graduate with a degree in chemical engineering and is employed as an environmental engineer. The adoptive parents are nonsmokers, rarely drink, own their own home and are active in their church. Their uncle, an Episcopal priest, baptized Jarrett, who attends church regularly with the adoptive parents. The adoptive parents have a supportive family group and Jarrett appears to be thriving under their care.

Family Court referred to the reports and testimony of the two expert witnesses who were called by the adoptive parents and the Law Guardian. Both testified that Jarrett has bonded with the adoptive parents and that removing Jarrett from their custody would cause him irreparable damage. Both witnesses expressed concern about the birth parents' psychological problems. One witness was of the opinion that the children currently in the birth mother's custody are "in serious jeopardy if she is left to her own devices without supervision and monitoring."

At the close of proof, the Law Guardian concluded that Jarrett's adoption by the adoptive parents is in his best interests and recommended the adoption. As earlier noted, the birth parents have raised no challenge to the court's findings and its conclusion that Jarrett's best interests are served by his adoption.

## VI

In light of our determination, we find it unnecessary to reach the arguments raised by the adoptive parents regarding Jarrett's constitutional liberty interest in having his custody determined on the basis of his best interests. We have considered the remaining contentions raised by the birth parents and conclude that they are without merit.

Accordingly, the order of Family Court should be affirmed.

PINE, J. P., LAWTON, DOERR and FALLON, JJ., concur.

Order unanimously affirmed, without costs.

In the Matter of the Adoption of JARRETT. KAREN DOE et al., Appellants-Respondents; STEVEN J., Respondent-Appellant. (Appeal No. 2.) [660 NYS2d 782] —Appeal unanimously dismissed as moot and order affirmed, without costs. (Appeal from Order of Niagara County Family Court, Crapsi, J.—Settle Record.) Present—PINE, J. P., LAWTON, DOERR, BOEHM and FALLON, JJ.